Leroy BOONE, Appellant,

v.

**E. L. PADERICK, Superintendent of the Virginia State Penitentiary, Appellee.**

No. 76–1090.

United States Court of Appeals,
Fourth Circuit.

Argued June 10, 1976.

Decided Sept. 13, 1976.

448

Maurice Sercarz and Joseph Delk, Third Year Law Students (Barry Nakell, Chapel Hill, N. C., on brief), for appellant.

Andrew P. Miller, Atty. Gen. of Virginia and Gilbert W. Haith, Asst. Atty. Gen., Richmond, Va., on brief, for appellee.

Before HAYNSWORTH, ·Chief Circuit Judge, and WINTER and CRAVEN, Circuit Judges.

CRAVEN, Circuit Judge:

Imprisoned for life plus 20 years for armed robbery and statutory burglary, Boone unsuccessfully petitioned the district court for a writ of habeas corpus. We reverse and hold that the writ should issue because the prosecutor concealed an offer of favorable treatment to Boone's principal accuser. Had the jury known of the prosecution witness' compelling motivation to establish Boone's guilt, there is a reasonable likelihood its verdict might have been different. Under such circumstances there is a denial of due process under *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Brady v. Maryland,* 373

U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *Mooney v. Holohan*, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935).

## I.

The promise of favorable treatment in return for cooperation with the prosecution, upon which Boone's petition rests, was made to Eugene Hargrove by Detective Coffield of the Virginia Beach Police Department. According to the record, Coffield told Hargrove that he knew that he (Hargrove) was involved in the robbery of Sandler's Seafood storehouse, that the police department would soon make arrests in the case, and that he better cooperate.

Hargrove did not at once agree to cooperate but later did so upon Coffield's promise that he would not arrest him for the Sandler burglary or for any other offenses which he knew Hargrove to have committed, and that he would use his influence with the Commonwealth Attorney in order to see that he would not be prosecuted.[1] According to Coffield, Mr. Lyle, the prose-

cutor in Boone's case, was told about Coffield's promises to Hargrove.

Lyle also testified at the habeas proceedings. He did not deny that Coffield told him of the promises but said he did not remember. Curiously, he stated that, in his own mind, he at all times believed it possible that Hargrove would be prosecuted but that he understood leniency would be appropriate.

Boone's attorney was never informed by the prosecutor or the detective or anyone else of Coffield's representations to Hargrove. But at trial, he apparently suspected as much and attempted to prove Hargrove's bias. On cross-examination he established that Hargrove had not been arrested or prosecuted in connection with this offense, which he freely admitted committing, and additionally brought out that Hargrove was allowed to retain property which he purchased with his share of the proceeds of the crime. But counsel got nowhere in his effort to uncover the prosecutorial bargain. Aided by the prosecutor, Hargrove revealed nothing of Coffield's promises.[2]

---

1. Coffield emphasized at the habeas corpus hearing that he told Hargrove this was a limited promise, and that while he would use his influence with the Commonwealth Attorney, there "was an element of risk here," which Hargrove understood, because he could not control the actions of others.

2. [BRYDGES] Q Are you charged with any crime? Are you charged with any offense regarding this break-in?
[HARGROVE] A No.
Q *Are you going to be charged with any?*
MR. LYLE: *Your Honor, he doesn't know whether he is going to be charged.*
MR. BRYDGES: *Well, he can tell me whether he has been told.*
MR. LYLE: *If he knows.*
Q What did they tell you about being charged?
A What's that?
Q What did they tell you about whether or not you were going to be charged? You have been free ever since, haven't you?
A Yes.
Q Okay. Now, what are they going to do about your involvement in it?
A Well, they told me they already knew what had happened. And they told me exactly the same thing I told them.
Q They told you what had happened so you told them?

A Yes, sir.
Q So you just told them right back?
A No, I went home. I left and came back the next day.
Q And then you told them all about it?
A Yes.
Q *And they said if you told them all about it they wouldn't charge you with anything?*
A *No, they told me it would be better for me to help them.*
Q Right. But you haven't been charged with any offense yet?
A No.
Q I mean, after this trial did they tell you that you were going to be charged with it?
A I don't know.
Q You get on the stand here today and you tell this 12-man Jury that you broke into the place and tied up the watchman and stole a lot of money; bought yourself a range, some furniture, some clothes and an automobile, and you sit there scot-free, right?
A Yes.
Q And in exchange for that you are going to tell on Leroy Boone, isn't that about the size of it?
A Yes, but—
Q All right, let's get right to the heart of the matter—
MR. LYLE: Let him answer the question.
THE COURT: What was the rest of that, Mr. Hargrove.

In closing argument, the prosecutor portrayed Hargrove as one who will swear to his own hurt and change not:

> And at no time is anybody more apt to tell the truth than when they are saying something that actually hurts. And that is the principle of law, Gentlemen, *that when a declaration is made that if it hurts you it is more likely to mean the truth,* no question about that.
>
> *And take that test and apply it to Eugene Hargrove, for instance, who has freely admitted participating in a felony, two felonies, which carry the sentences which the Judge just outlined to you.*

(Emphasis added.)

Later, he did not shrink from depicting Hargrove as conscience stricken, and crediting him with altruism, clearly implying that Hargrove would not go unpunished:

> But I submit to you that we are—and I say we I mean you ought to thank God that every now and then *somebody's conscience rises to the top and somebody tries to do the right thing.* . . .
>
> Every now and then we are lucky enough—and I say we, I mean you, too, because you live in this Commonwealth and it's your health and safety that's at stake, just like everybody else's. *We are lucky enough to get a case where one of the participants tries to do the right thing.*
>
> *Now, as I say, it's up the Commonwealth which can designate in what order these cases are to be tried. We chose to try Leroy Boone today, separately, and that's our law-given right.*
>
> And I *take exception to Mr. Brydges' inferences that Mr. Hargrove will walk the streets free the rest of his life notwithstanding.* . . .[3]

(Emphasis added.)

A Not in exchange of that. (Emphasis added.)

**3.** Hargrove was never prosecuted.

**4.** *See* note 2 *supra.*

## II.

### A.

█ Whether *Giglio* applies depends upon whether the jury may have been falsely led to believe that Hargrove was motivated solely by conscience and altruism and that there was no deal when in truth he responded to Coffield's promises. *See United States v. Agurs,* ——— U.S. ———, ——— n. 9, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Hargrove's flat denial that "they" had told him he would not be charged[4] skirts the edge of perjury only because the questioner knew nothing of Coffield's role and "they" embraces others who promised nothing. But the prosecutor made statements which were clearly intended to give the impression that Hargrove knew nothing about possible lenient treatment, that he testified against, rather than in aid of, his penal interest, and that his testimony in general was the product of an active conscience.

We hold that Hargrove's general denial of any promise of leniency, when coupled with the prosecutor's emphasis upon altruistic motivation, constitutes false evidence of which the prosecutor knew or should have known. *Cf. Mooney v. Holohan, supra.*

### B.

The district court reasoned that *Giglio* was inapplicable because the promise that was made emanated from the police and not the prosecutor's office, and because Coffield lacked authority to grant immunity. We disagree.

"█ The district court stated that it found no case holding that the detective-prosecutor relationship is to be viewed in the same light as the prosecutor-prosecutor relationship governed by *Giglio.*" But in *Barbee v. Warden,* 331 F.2d 842, 846 (4th Cir. 1964),[5] we held that where material

**5.** *See, e. g., United States v. Bryant,* 142 U.S. App.D.C. 132, 439 F.2d 642, 650 (1971); *Emmett v. Ricketts,* 397 F.Supp. 1025, 1040–42 (N.D.Ga.1975).

evidence which tends to exculpate the defendant is not disclosed, such failure is not neutralized because it was in the hands of the police rather than the prosecutor.

Failure of the police to reveal such material evidence in their possession is equally harmful to a defendant whether the information is purposely, or negligently, withheld. And it makes no difference if the withholding is by officials other than the prosecutor. The police are also part of the prosecution, and the taint on the trial is no less if they, rather than the State's Attorney, were guilty of the non-disclosure.

*Id.* at 846 (footnote omitted).

■ Alternatively, we may also rest decision on attribution of the promise to the prosecutor's office. Coffield informed Lyle of the promise. Lyle, while stating he did not remember being told of the promise and recounting his subjective determination that, in any case, he was not foreclosed from prosecuting Hargrove, did not deny it.[6] If, as in *Giglio*, knowledge is imputed from one member of the prosecutor's office to another where there was no actual communication, we believe *a fortiori* it must be attributed to a member of that office who had been told of the promise.

■ Similarly, we believe that *Giglio* is applicable despite Coffield's lack of authority to bind the government to any agreement and the tentativeness of the promise. In *Giglio*, according to the affidavit of one member of the prosecutor's office, the cooperating witness was told "that if he did testify he would be obliged to rely on the 'good judgment and conscience of the Government' as to whether he would be prosecuted." *Id.* 405 U.S. at 153, 92 S.Ct. at 765 (footnote omitted). Furthermore, the district court in *Giglio* had found that, however definite the first promise had been, the prosecutor who made it was not authorized to do so. The Supreme Court held that neither fact was fatal to defendant's claim. Instead, the Court focused upon the fact that a no-prosecution promise had in fact

been made, and that both the witness, in his testimony, and the prosecutor, in summation, had stated otherwise. The Court held that, since the government's case depended almost entirely on this witness' testimony, his "credibility as a witness was . . . an important issue in the case, and evidence *of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it.*" *Id.* at 155, 92 S.Ct. at 766 (emphasis added).

■ Finally, we note that rather than weakening the significance for credibility purposes of an agreement of favorable treatment, tentativeness may increase its relevancy. This is because a promise to recommend leniency (without assurance of it) may be interpreted by the promisee as contingent upon the quality of the evidence produced—the more uncertain the agreement, the greater the incentive to make the testimony pleasing to the promisor.

### III.

As the district court correctly noted, finding *Giglio* applicable to this case does not determine whether a new trial is required. However, we may put to one side one of the two factors which he considered in determining a new trial unnecessary—defense counsel's "searing attack against Hargrove's testimony." No matter how good defense counsel's argument may have been, it was apparent to the jury that it rested upon conjecture—a conjecture which the prosecutor disputed.

■ The controlling issue, and one which we find difficult, is the materiality of the evidence withheld. Under *Giglio*, "[a] new trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . . .'" *Id.* at 154, 92 S.Ct. at 766. In determining that issue, we must examine both the importance of Hargrove's testimony, which would be affected by his credibility, and the weight of the independent evidence of guilt.

---

**6.** Since it was more than six years between the trial and the habeas corpus proceeding, the

lack of a sharp memory of the details of pretrial negotiations is understandable.

The physical evidence introduced at trial included only a silver dollar found in Boone's pocket when arrested (a sizeable number of silver dollars were taken from Sandler's), a green jacket seized during a search of Boone's car (a robber was described to have worn khaki clothing), a flashlight found at the robbery scene, and a partially filled box of .38 caliber ammunition found in Boone's car. The district court correctly viewed as insignificant both the silver dollar and the jacket. The possession of neither was incriminating. He similarly discounted evidence that shortly after the robbery Boone purchased a car, paying approximately $650 cash, perhaps because Boone's father and grandfather swore they provided the car money.

The district court treated the discovery of the .38 caliber ammunition differently, considering it significant evidence. However, at trial, the *only* evidence identifying a .38 as the weapon used in the crime was the testimony of Hargrove.[7] The State, on appeal, also tells us that the flashlight was an incriminating item, contending it was Boone's flashlight. Again, however, *only* Hargrove's testimony identified it as Boone's.

No other physical evidence linked Boone to the crime. There were no fingerprints; the victim could make no identification at all.

Three witnesses implicated Boone in the crime. Of these Hargrove was by far the most important.[8] He testified that he was a participant in the crime along with Boone and another individual, Billups. He stated that, on the way home from a party in Norfolk, Boone proposed that they burglarize Sandler's; that the axe and crowbar used to break in, as well as the .38 caliber pistol and flashlight, were Boone's; that Boone alone wore a mask and carried a gun during the robbery; that after breaking into the building and tying up the night watchman, they broke into the vault and removed the money; and that, after splitting up the cash, they buried the stolen bonds near Lake Smith.

Wallace Hines testified that on the afternoon after the robbery[9] he talked to Boone. Boone, according to Hines' testimony, was displaying a sizeable roll of money and wanted to "shoot some pool . . . for some money." Later that evening, Hines testified, Boone told him he got the money at Sandler's.[10] Hargrove's name was also mentioned.

Hines also testified that he discovered some of the bonds at Lake Smith lying on the ground while he was walking through the area.[11] And he testified that he told the police about the location of the bonds, led them to the place they were buried, and

7. Witness Hines did apparently tell the police that Boone was the gunman in the robbery and that the weapon involved was a .38, and it was upon this information that a search warrant for Boone's car was obtained. Transcript at 141–43. However, Hines did not give such testimony at trial, and the jury did not otherwise learn of his statements to the police.

8. A March 9, 1969, article in the Virginia-Pilot on the Boone prosecution attributes to Lyle the following statement: "without [Hargrove's] testimony we wouldn't have gotten a conviction on either of the other two men [Boone and Billups]." Petitioner's Exhibit 2. At the habeas corpus proceeding, Lyle was asked about this statement. He responded that he did not "recall that remark," but he could not "deny that I told him that though . . . .." App. 168–69.

9. The robbery occurred in the early morning hours of January 14.

10. According to questions asked by defense counsel Brydges on cross-examination, Hines' trial testimony concerning the circumstances of Boone's admission differed from that given at the preliminary hearing. See App. 70–73. The record does not contain a transcript of the preliminary hearing, if such was ever made.

11. Hines denied that anyone told him the location of the buried bonds. Both the prosecutor, in closing argument, ("Gentlemen, now whether he actually found that bond or whether he had sources of information that we don't know about. I don't know." Transcript at 259.) and the district judge ("[A]t trial it emerged that he had, under somewhat questionable circumstances, been the one to lead the police to where the Sandler proceeds had been buried.") viewed this account somewhat skeptically.

provided other information while in jail on charges of breaking into a school.

Fay Simpson, Boone's former girlfriend, testified that some time in January she, Boone, "and this guy named Bubba" went riding around Lake Smith; that they stopped the car near the lake and just off Shell Road (the area where the bonds were found) and went to a hole in the grass;[12] and that Boone stated, "Somebody got it." She further testified that after they got back to Norfolk she asked about this incident and the origin of the $500 Boone had in his possession and was told "Binky, and Fella and himself had stole some money . . . [and] that somebody had taken it from him, some of it." Boone did not tell her where the money had been stolen.[13]

The defense offered alibi witnesses who testified that Boone was present at an all-night party during the robbery, and that he did not leave until 7 a. m. the next morning. Boone's father and grandfather testified that they provided him with the cash for his automobile purchase. And his father also testified that he owned the .38 caliber ammunition found in Boone's car.[14] Finally, Boone took the stand and denied any involvement in the robbery.

■ The task of determining whether there is a "reasonable likelihood" that evidence of the promise of favorable treatment to Boone would have affected the judgment of the jury is not an easy one. It is especially difficult in a case such as this where internal conflicts and inherent improbability in almost every witness' testimony suggests the possibility of perjury. We believe, however, that with the evidence of Coffield's promise and without the prosecutor's misrepresentation that there was no promise of favorable treatment and his mis-

interpretation that Hargrove testified against his penal interest and out of a sense of conscience, which buttressed his credibility, there is reasonable likelihood that the jury would have reached a different result. Only Hargrove testified concerning the details of the robbery from direct observation; his testimony was critical to the conviction. Without him the jury would have known only of vague admissions and weak circumstantial evidence linking him to the robbery.

On remand, the district court will issue the writ unless the state elects within a reasonable time to try Boone again.

*REVERSED.*

---

**12.** Clearly, circumstantial evidence points to the fact that this hole was the same one in which the police had found the bonds. However, the prosecutor did not have Simpson identify pictures of the hole from which the bonds were recovered. These pictures had been introduced into evidence. Exhibits 13 & 14, Transcript at 73. And Hargrove, on cross-examination, stated that there were "a lot of" holes in the area where they buried the bonds. App. 86.

**13.** On cross-examination and in summation, defense counsel Brydges contended that Simpson's testimony differed dramatically from her pretrial statements to him. Transcript at 181–82; App. 105–06.

**14.** As the district court noted, this explanation of the source of the ammunition was in part inconsistent with Boone's own testimony.