UNITED STATES of America, Appellee,

v.

**Paul Wilbert SUTTON, Appellant.**

UNITED STATES of America, Appellee,

v.

**Jesse Thomas LEE, Appellant.**

UNITED STATES of America, Appellee,

v.

**Charles SUTTON, Jr., Appellant.**

**Nos. 76–1036 to 76–1038.**

United States Court of Appeals,
Fourth Circuit.

Argued June 10, 1976.

Decided Oct. 21, 1976.

Thomas J. Harlan, Jr., Norfolk, Va. [court-appointed counsel], for appellant in 76–1037.

Richard F. Holladay, Jr., Virginia Beach, Va. [court-appointed counsel], for appellant in 76–1038.

Reid H. Ervin, Norfolk, Va., [court-appointed counsel], for appellant in 76–1037.

Sonnie Cuffey, Norfolk, Va. [court-appointed counsel], for appellant in 76–1036.

Doumar, Pincus, Knight & Harlan, Norfolk, Va., on brief, for appellants in 76–1036, 76–1037 and 76–1038.

Roger T. Williams, Asst. U.S. Atty., Norfolk, Va. (William B. Cummings, U.S. Atty., Thomas K. Berger, Asst. U.S. Atty., Alexandria, Va., on brief), for appellee in 76–1036, 76–1037 and 76–1038.

Before HAYNSWORTH, Chief Judge, and WINTER and CRAVEN, Circuit Judges.

CRAVEN, Circuit Judge:

The defendants, Jesse Thomas Lee, Charles Sutton, Jr., and Paul Sutton, were convicted of violating 18 U.S.C. § 371 by conspiring to rob The Peoples' Bank of Chesapeake, in Chesapeake, Virginia. They sought a new trial on the ground that the government failed to disclose that the testimony of its key witness was induced by threats of an F.B.I. agent, invoking fundamental fairness concepts enunciated in *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); and *Mooney v. Holohan,* 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935).

The district court viewed the motion as one based upon recantation of testimony given by a witness, and, citing *United States v. Williams,* 415 F.2d 232 (4th Cir. 1969), and *United States v. Johnson,* 487 F.2d 1278 (4th Cir. 1973), denied the motion. We hold those cases inapposite,[1] and reverse and remand.

I.

Jesse Thomas Lee and Paul Wilbert Sutton spent many of the daylight hours of June 19, 1975, in and out and around a trailer-type branch bank of The Peoples' Bank of Chesapeake at the corner of Volvo Parkway and Battlefield Boulevard in Chesapeake, Virginia. Jesse entered the bank about 11 a.m. seeking directions to Volvo. He was remembered because (a) he did not know whether he wanted to go to the Volvo plant or to the Volvo office, (b) his hands were trembling, (c) it was a warm day and he was wearing a knitted wool cap similar to those worn on watch in the Navy in bad weather, and (d) he was six feet five inches tall.

Jesse came back about 1:30 p.m. but stayed out of the bank while his companion, Paul, not quite so tall, entered the bank and asked to change a $5 bill. Paul was remembered because (a) he was with Jesse, who had been noticed previously, and (b) when the teller offered him five $1 bills, he asked instead for a roll of dimes.

---

1. *Williams* and *Johnson* exemplify the standards appropriate for considering motions for new trials based on recantation by a prosecution witness or newly discovered evidence from a neutral source, and do not speak to the question of the government's duty to disclose under the doctrine of fundamental fairness.

Jesse and Paul walked away from the bank together, then entered an old light green Lincoln Continental driven by another person. When the tellers stepped out on the porch of the bank to better observe their departure, the driver of the car sped away quickly.

Jesse and Paul came back to the bank about 4 p.m.—this time in a light green Chevy Nova II owned by key witness Redus Cannon and driven by defendant Charles Sutton, Jr. Charles let Jesse and Paul out of the car immediately behind the bank and pulled into a nearby parking lot no more than 20 feet from FBI Agent Smith. After eyeballing the agent for perhaps ten seconds, Charles Sutton, Jr., left the parking lot fast, but not before Agent Smith got his license tag number. At this point, Agent Smith decided it would be best to stop what he verily believed was about to become a bank robbery, and thereupon apprehended and arrested Paul and Jesse as they were walking toward the bank. Jesse had in his pocket a loaded Baretta automatic pistol. Paul had on a black nylon stocking beneath his wool knit hat and a folded white plastic bag tucked in his sock. Charles Sutton, Jr., the driver, who had sped away, also was wearing a woolen knit hat.

All three defendants were charged and convicted of conspiring to rob the bank despite their testimonial defense that they were seeking employment that day at the Volvo office located close to the branch bank. What turned the government's circumstantial case into an overwhelming one was the direct testimony of Redus Cannon. He testified that the defendants borrowed his car that day to go "stick up a place." And the prosecutor supported Cannon's veracity by falsely assuring the jury "no one

threatened Cannon."[2] At a post-trial hearing, F.B.I. Agent Smith testified that in his first interview with Witness Cannon he accused him of driving Paul and Jesse in the Nova II and letting them out behind the bank, but that when he made the accusation he knew Cannon was not the driver. Smith said he made the accusation "as an inducement to him (Cannon) to give us the complete story." Smith agreed that such a false accusation could possibly have some intimidating effect.

Smith also testified that he "may have said something . . . to the effect that: 'if I come into court, Cannon, and testify that you're the one that drove the car and you testify against me, the question will have to come down to the jury as to which one they're going to believe.'" Asked whether that would not have been a statement calculated to intimidate Cannon, Agent Smith responded, "if you want to use that word," and later agreed that such a statement could possibly be viewed as "calculated to intimidate someone."

## II.

*United States v. Agurs,* —— U.S. ——, 96 S.Ct. 2392, 49 L.Ed.2d 342 (U.S. June 24, 1976), requires, we think, that we distinguish between what may be termed "veracity" (or perjury) cases and cases involving "discovery" of evidence known to the prosecution but not involving prosecutorial misconduct or corruption of the truth-finding process. *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1975), was a veracity case. There the government failed to disclose a promise of leniency made to a key government witness who had testified no promise had been made to him. In an opinion by the Chief Justice, it was held that when the reliability of a witness

**2.** The record does not suggest the prosecutor then knew of Agent Smith's threat, and we accept that he did not. Thus, we do not impugn his personal integrity. But legally what Smith knew must be imputed to the prosecutor. *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *United States v. Bryant,* 142 U.S.App.D.C. 132, 439 F.2d 642, 650 (1971); *Barbee v. Warden,* 331

F.2d 842 (4th Cir. 1964). For as Judge Sobeloff observed in *Barbee,* in the highly relevant Fourteenth Amendment context:

> The police are also part of the prosecution, and the taint on the trial is no less if they, rather than the State's Attorney, were guilty of the nondisclosure.

331 F.2d at 846.

may be determinative of guilt or innocence, nondisclosure of evidence that affects credibility is a denial of fundamental fairness required by the Due Process Clause of the Fifth Amendment. 405 U.S. at 154, 92 S.Ct. 763. We perceive no difference between concealment of a promise of leniency and concealment of a threat to prosecute. In *Giglio,* the standard for awarding a new trial was said to be whether there is any reasonable likelihood that disclosure would have affected the judgment of the jury. 405 U.S. at 154, 92 S.Ct. 763.

██ *Agurs,* on the other hand, may be viewed as a "discovery" case. Neither a threat to prosecute nor a promise of leniency was involved. Instead, there was the rather typical contention that the government possessed information unknown to the defendant which it should have produced, *i.e.,* evidence of a prior criminal record and violent disposition of the deceased. In an opinion by Mr. Justice Stevens, the Court concluded that, since in *Agurs* there was no prosecutorial misconduct and no reason to question the veracity of any of the prosecution witnesses, the test of any reasonable likelihood that the jury verdict could have been affected was not applicable. *Agurs, supra,* at ——, 96 S.Ct. 2392. The Court thereupon held that in the ordinary "discovery" type of case the standard of materiality that justifies granting a new trial is more difficult to meet, and that the petitioner can satisfy it only by showing that the omitted evidence would have created a reasonable doubt that did not otherwise exist.[3] We believe that the *Agurs* standard is

inapplicable in the *Giglio*-type situation with which we are confronted in the present case, *i.e.,* where a false statement intended to shore up the credibility of a witness has been made at trial.

In *Boone v. Paderick,* 541 F.2d 447 (4th Cir. Sept. 13, 1976), we recently held that a state trial was flawed because the prosecutor concealed an offer of favorable treatment to the defendant's accuser. We said that if the jury had known of the prosecution witness' compelling motivation to establish guilt, there was a reasonable likelihood its verdict might have been different. So it is here. Without Cannon's testimony there is no evidence indicating a purpose to rob the bank except for bizarre circumstances that are not necessarily inconsistent with the possibility of innocence. The prosecutor recognized the inherent weakness of a wholly circumstantial case when he told the jury that no one ever threatened Cannon. We see no legal difference between the perjury of a witness in *Giglio* (denying he had been offered leniency) and the false statement of the prosecutor here. Although made innocently, *see* footnote 2, *supra,* at p. 1241 it has the same potential impact on the jury.

The government contends, however, that there is no reasonable likelihood that the verdict would have been affected because of the following testimony elicited from Cannon on cross-examination in the presence of the jury:

Q. Did they tell you that you could probably be indicted or arrested for attempted bank robbery?

---

3. Mr. Justice Stevens characterized as most "severe" the burden upon a defendant who seeks a new trial because of newly discovered evidence from a neutral source. Such a petitioner must demonstrate that the "newly discovered evidence probably would have resulted in an acquittal." *United States v. Agurs,* —— U.S. ——, 96 S.Ct. at 2401, 49 L.Ed.2d 342 (1976); *Ashe v. United States,* 288 F.2d 725, 733 (4th Cir. 1961). This is the heaviest burden. Coming next on the scale is the *Agurs* burden of demonstrating that evidence known to the prosecution but not disclosed to the defendant would have "create[d] a reasonable doubt that did not otherwise exist . . . ." —— U.S. ——, 96 S.Ct. at 2401. *But see* —— at

——, 96 S.Ct. at 2403 (Marshall, J., dissenting) ("[T]he burden thus imposed on the defendant is at least as 'severe' as . . . the burden he generally faces on a Rule 33 motion."). At the other end of the scale, the easiest burden for a petitioner is where the failure of the prosecutor to disclose involves "a corruption of the truth-seeking function of the trial process," which usually occurs in the context of prosecutorial misconduct and involves the veracity of any of the prosecution witnesses; that burden is sustained "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." —— U.S. at ——, 96 S.Ct. at 2397.

A. Did they tell me—

Q. Did they tell you that at FBI Headquarters?

A. Possible.

Q. Possible. Were you scared?

A. Yes, sir.

Q. Did they say that if you gave them a statement that things would go better for you or anything to that effect?

A. Yes, sir.

We agree that the foregoing admission by Cannon ameliorates the probable effect of disclosure to the jury of Smith's threat. We are also aware that "[i]f the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor." *Agurs, supra,* at ——, 96 S.Ct. at 2400. Thus we attempt no distinction between false or unlawful threats made up out of whole cloth for the purpose of intimidation and true threats that simply arise under the evidence and the law. Both go to the veracity of a witness. It is time honored to argue to a jury that an accomplice's testimony is shaped by self-interest and a real fear of the facts and the law, as the foregoing testimony illustrates. Whether a false threat has a similar effect is also for jury determination. The jury may well have discounted Cannon's fear of prosecution in his admitted role as lender of the automobile, but might have taken much more seriously his apprehension that Agent Smith falsely would place him in the vicinity of the bank as the driver of the getaway car— unless he testified to please the government. In short, as in *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), here the prosecution allowed a false impression to be created at trial when the truth would have directly impugned the veracity of its key witness.

Viewing the record as a whole, we conclude that the jury's verdict might have been different had it known of Cannon's apprehension that he might be put to trial as an active perpetrator. Because the jury was incorrectly assured that Cannon had not been threatened, and because Smith's threat may reasonably be viewed as impugning Cannon's veracity, and because the case was otherwise wholly circumstantial, we conclude the government's failure to disclose Smith's effort to induce (or coerce) Cannon's testimony was fundamentally unfair and in violation of the Due Process Clause of the Fifth Amendment.

REVERSED.