UNITED STATES of America, Appellee,

v.

Robert MEINSTER a/k/a Robbie, Appellant.

UNITED STATES of America, Appellee,

v.

Robert PLATSHORN (a/k/a Bob Auction, a/k/a Bob Knapp, a/k/a Bob Elliott), Appellant.

Nos. 79–5025, 79–5026.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 7, 1979.

Decided April 18, 1980.

Mark E. Kogan, Philadelphia, Pa., (Dennis J. Cogan, Gilbert B. Abramson, Philadelphia, Pa., Frederick D. Anderson, Wilmington, N. C., on brief), for appellants.

Herman E. Gaskins, Jr., Sp. Asst. U. S. Atty., Raleigh, N. C., (George M. Anderson, U. S. Atty., Raleigh, N. C., on brief), for appellee.

Before HALL and MURNAGHAN, Circuit Judges, and PERRY,* District Judge.

K. K. HALL, Circuit Judge:

Robert Platshorn and Robert Meinster appeal from convictions under 21 U.S.A. § 952(a), 960(a)(1) and 18 U.S.C. § 2 for aiding and abetting the importation of marijuana. They present numerous claims of error; only two need discussion: (1) Whether appellants are entitled to a new trial because the government allowed its key witness to give false testimony regarding offers of leniency, and (2) Whether the evidence presented was sufficient to sustain a conviction on charges of aiding and abetting. Finding no error in the district court's rulings, we affirm.

The marijuana importing operation was conceived in July, 1977, when Platshorn met at his Florida home with Mark Phillips and George Purvis, Jr., a Fayetteville, North Carolina, automobile dealer who had come to Florida at Phillips' request. The three discussed plans to bring a boat load of marijuana into North Carolina over Labor Day weekend, and Purvis returned to North Carolina to find a suitable offloading site.

Purvis selected six potential sites and contacted Platshorn, through Phillips. Platshorn arrived in North Carolina on Au-

---

* Honorable Matthew J. Perry, United States District Judge for the District of South Carolina.

gust 24. The following day, the three, having leased a helicopter, selected an offloading site on the Brunswick River. Thereafter, Platshorn's yacht, "Nature's Way," was brought to the site to test the depth of the water. Platshorn provided three pickup trucks and twenty thousand dollars in cash for the purchase of other equipment necessary for the operation.

The Labor Day weekend scheme aborted. The mothership "Presidential," carrying a cargo of marijuana ran aground near the Bahamas. Phillips and a friend, Lee Smith, set out for the Bahamas on the "Nature's Way" in an attempt to salvage the cargo, but the yacht broke down on the way south and was towed to port by the coast guard.[1] Phillips reassured Purvis that another boat would be on the way in a few weeks.

In late September, Purvis returned to Florida and met with Phillips and Robert Meinster, Platshorn's partner in the South Florida Auto Auction, to arrange for the importation of another shipment. Because they believed "Nature's Way" to be under suspicion, they sought out Wade Bailey, owner-captain of the "Osprey," to rendezvous with the mothership in early October. Bailey was a government agent.

After several delays and some additional planning, the scheme finally crystallized in early December. Accompanied by Smith and Purvis, Meinster took a room at the Hilton hotel in Wilmington, North Carolina, on November 30. Richard "Chip" Grant, who had followed the mothership "Don Elias" up the coast in a truck equipped with radio scanners, arrived the next day. Radio equipment was also set up in Meinster's room so that he and Grant could monitor law enforcement communications. Meinster then left town, while Purvis and Grant located and leased storage space for the shipment. All returned to the hotel room on December 7 for final arrangements. The next day Wade Bailey and his crew took the "Osprey" to its rendezvous with

the "Don Elias," and eleven tons of marijuana were transferred to the "Osprey." Bailey brought his cargo back up the Cape Fear River to its final destination on the Brunswick River. The cargo was partially unloaded when customs officials arrived to seize the shipment and arrest Lee Smith, who was leaving the site in a rental truck full of marijuana.

Grant and Meinster immediately returned to Florida. Later, Meinster met with Purvis, Phillips and Platshorn in Florida to discuss what had happened in North Carolina. Both Platshorn and Meinster provided funds for Smith's defense and expenses. Purvis remained in Florida, living with Platshorn and working at the South Florida Auto Auction until early February, 1978, when he surrendered to North Carolina authorities. Afterwards, he returned to Florida where he was approached by the Drug Enforcement Administration.

## I. *ALLEGATIONS OF PERJURY*

Appellants' principal claim is that the prosecution knowingly allowed its chief witness, George Purvis, Jr., to testify falsely that he had received no offer of leniency in exchange for his cooperation. They contend there was a two-fold "deal" struck in a related investigation in the Southern District of Florida, and Purvis' emphatic denial of this arrangement at trial, supported by the prosecutor's arguments and continued refusal to acknowledge it, deprived appellants of a fair trial under principles set forth in *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), and *Boone v. Paderick*, 541 F.2d 447 (4th Cir. 1976).[2]

The district judge heard testimony on this issue from the Justice Department attorney in charge of the Florida investigation, the Assistant United States Attorney who handled the North Carolina prosecution, and defendants' counsel. In its Memo-

---

1. Meanwhile, the marijuana on the "Presidential" was seized, and Meinster called Purvis to tell him to call off the salvage attempt.

2. See also *United States v. Sutton*, 542 F.2d 1239 (4th Cir. 1976); *Mooney v. Hollohan*, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935).

randum of Decision of December 22, 1978, the court found:

> [The Florida] investigation was separate and apart from the investigation surrounding the seizure of marijuana in the Eastern District of North Carolina. Purvis cooperated by providing valuable information to the DEA agents in Florida and performed in an exemplary fashion while working undercover for the DEA. In return for Purvis' cooperation the United States Attorney's office in Florida decided not to prosecute Purvis, although Purvis was never told of that decision. However, the DEA officials and the United States Attorney's office in Florida did promise to make Purvis' cooperation with them known to this court in North Carolina at the time of his sentencing following his guilty plea to the charges brought against him in this state. This was in exchange for Purvis' cooperation regarding the Florida investigations, and was not conditioned on Purvis' cooperation with the authorities in North Carolina.

We find no basis for disputing these findings, and find them dispositive of appellants' claim.

■ Assuming the North Carolina prosecutor had constructive, if not actual knowledge of these facts,[3] we are nevertheless unable to conclude that a new trial was required under *Napue, Giglio* and *Boone.* The intent of those holdings is not to punish the prosecutor; rather the primary concern is that the jury not be misled by the prosecution's knowing use of perjured testimony.[4] The critical question is whether the undisclosed promise was material, *i. e.,* whether the purported false testimony "could . . . in any reasonable likelihood have affected the judgment of the jury." *Boone, supra,* at 451, *quoting Giglio v. United States,* 405 U.S. at 104, 92 S.Ct. at 766.

When the terms of a "deal" between the government and a witness create a motive

---

3. Herman Gaskins, the United States Attorney for the Eastern District of North Carolina had prepared a memorandum six months before which reads in part:

    "On this date I received a call from Chuck Jaffee in connection with a telex previously received. He indicated that no promises have been made to George Purvis in Florida except that any cooperation with the Drug Enforcement Administration there would be brought to the attention of the judge in North Carolina. His lawyers had recommended to him that he not engage in any covert activities for DEA but that he felt that such activity would help him with the judge in North Carolina."

    The district court concluded that Gaskins did not recall either the conversation or the memorandum, which was in the file in another, related case, and was innocent of any intent to mislead the defense or the jury.

4. There is also a question as to whether Purvis' statements in the jury's presence were perjured at all. Concededly, the following exchange took place in a pretrial hearing before the court:

    Q (By Mr. Cogan) In fact, that is the arrangement that, in fact, has remained static since that time. No one has made any promises or assurances or any deals with you at all; isn't that right?
    A No one has made any deals with me at all.

    Q That includes not only the people in North Carolina, but the people in Florida as well; isn't that right?
    A That is correct.
    Q Mr. Jaffee and all of his people down there, no one has made any promises to you at all; isn't that right?
    A That is correct.

    In his testimony before the jury, however, Purvis did not specifically deny the Florida deal:

    Q (By Mr. Cogan) As I understand your testimony, Mr. Gaskins and the people in his office here and the people in Florida in the U.S. Attorney's office, and Mr. Vopat and all of the other agents that you may have had dealings with: no one has told you that they will be in a position to do anything for you as a result of your testimony that you have offered; isn't that right?
    A They told me that they could make no promise to me whatsoever because what took place was in Mr. Gaskins' jurisdiction, and that Mr. Gaskins has made me no promises or anything else.
    Q The answer to my question is that no one has, in fact, made you any promises; is that right?
    A That is correct. (T. 421–22)

    The district court noted that the "distinct thrust of Purvis' denial was directed to the fact that he was offered nothing in exchange for testimony *given in North Carolina.*" (Emphasis in original)

for falsification, the jury's perception of the witness' testimony is likely to be affected. Cases such as *Giglio, Napue* and *Boone* illustrate situations where the prospect of immunity or favorable treatment awaited the witness at the conclusion of trial if his performance on the stand was favorable to the government. We think it obvious that promises of immunity or leniency premised on cooperation in a particular case may provide a strong inducement to falsify in that case.

This is a very different situation. Nothing was promised in exchange for Purvis' testimony in this case. Herman Gaskins, the Assistant United States Attorney in North Carolina, repeatedly refused to promise anything in exchange for Purvis' testimony, nor did he hint that his aid might be forthcoming depending on the outcome. Although government officials in Florida promised to bring Purvis' cooperation there to the attention of the sentencing judge in North Carolina in exchange for his cooperation in Florida, this promise was not conditioned on cooperation in this case.[5]

We do not think the circumstances of Purvis' cooperation in Florida created a substantial motive for falsification in this case.

Whatever impact the Florida "deal" might have had on the jury is further diminished when the government's evidence is viewed in its entirety. Although Purvis was undoubtedly a key witness, other testimony provided independent proof of guilt.

Co-conspirator Lee Smith[6] testified at length about his participation in the operation, beginning with the unsuccessful attempt to rescue the "Presidential's" cargo.

He personally assisted Meinster in setting up radio monitoring equipment in the Wilmington Hilton and participated, along with Meinster and others, in various monitoring, planning and support activities on the final day of the operation. And it was Smith who was arrested during the offloading and after his arrest received financial assistance from Platshorn and Meinster.

Smith provided substantial independent proof of appellants' guilt. In addition, the government offered extensive documentary evidence to corroborate the testimony of both Purvis and Smith. We think this evidence was more than sufficient to offset any conceivable impeachment value inherent in Purvis' arrangement with the government authorities in Florida.

■ Finally, we think appellants' prior knowledge of the Florida "deal" precludes our granting the relief they seek. On or before the first day of trial, defense counsel spoke to Walt Schroeder of the Department of Justice in Miami and was informed there was a deal in Florida. Counsel then asked U. S. Attorney Gaskins if there were any deals, and he again insisted there were none. Defense counsel took no further action on the matter, and made no attempt to obtain as a witness any of the Florida officials or take the matter to the trial judge. Thus, defendants had information from the very office that made the "deal" with Purvis, yet were content to accept—until after trial—the denials of the North Carolina prosecutor.[7] We think appellants waived their objection to Purvis' testimony by waiting until after trial to bring the question to the attention of the trial judge.[8]

---

5. Similarly, the decision not to prosecute in Florida, which was not the subject of a promise in any event, was independently made by Florida officials because of Purvis' cooperation in the Florida investigation.

6. Smith had already been convicted and sentenced.

7. The district court noted: "In view of Mr. Gaskins' excusable lapse of memory it thus appears at the time of the Meinster and Platshorn trial counsel for defendants were more

knowledgeable concerning Purvis' deal in Florida than he was."

8. The authorities upon which appellants rely are premised on the defense's ignorance of the undisclosed deal. In *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the Supreme Court described these cases in a three-pronged analysis under "the rule of *Brady v. Maryland* [373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215]."

The rule of *Brady v. Maryland* . . . arguably applies in three different situations.

*United States v. Harris*, 498 F.2d 1164 (3d Cir.), *cert. den.*, 419 U.S. 1069, 95 S.Ct. 655, 42 L.Ed.2d 665 (1974); *United States ex rel. Regina v. LaVallee*, 504 F.2d 580 (2d Cir. 1974), *cert. den.* 420 U.S. 947, 95 S.Ct. 1330, 43 L.Ed.2d 425 (1975); *see also Brown v. United States*, 556 F.2d 224 (3d Cir. 1977).

## II. AIDING AND ABETTING—SUFFICIENCY OF THE EVIDENCE

■ Appellants contend that the absence of a guilty principal precludes their conviction on aiding and abetting charges. They insist that importation by government agent Wade Bailey was not illegal, and therefore they cannot be guilty of aiding and abetting him in the commission of a crime. We find this argument without merit.

■ In order to sustain a conviction on charges of aiding and abetting "[i]t need only be established that the act constituting the offense was in fact committed by someone." *United States v. Snow*, 537 F.2d 1166, 1169 (4th Cir. 1976) *quoting Meredith v. United States*, 238 F.2d 535, 542 (4th Cir. 1956). We have no difficulty concluding that the government proved illegal importation. Active participation by a government agent, even in the critical act of transporting a controlled substance into the country, does not absolve other participants of the offense. *United States v. Gould*, 419 F.2d 825 (9th Cir. 1969); *Haynes v. United States*, 319 F.2d 620 (5th Cir.), *cert. den.* 375

U.S. 885, 84 S.Ct. 161, 11 L.Ed.2d 115 (1963); *see also United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973).[9]

■ We also reject Platshorn's assertion that the evidence is insufficient to support his conviction because his participation in any drug smuggling operation ceased with the abortive Labor Day shipment. He claims the record is devoid of any evidence directly linking him to subsequent activities.

The evidence taken in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), shows that Platshorn launched a plan designed to culminate in the illegal importation of a boat load of marijuana to a site on the Brunswick River. To this end he provided funds, counselling and equipment.[10]

The failure of the Labor Day importation attempt did not dissipate the plan. After the breakdown of the "Nature's Way," Phillips told Purvis to "keep everything together" because "he felt sure he would be able to put something else together" in a few weeks. The events that ensued also involved Phillips, Purvis and Meinster.[11] According to Purvis' testimony, Platshorn was to take a more passive role because he was under suspicion after the Labor Day events.[12] By remaining in Florida he would divert the attention of the authorities.

Each involves the *discovery after trial of information which had been known to the prosecution but unknown to the defense.* 427 U.S. at 103, 96 S.Ct. at 2397. *Brown v. United States*, 556 F.2d 224 (3d Cir. 1977).

9. Appellants also assert that the government knowingly allowed Wade Bailey to offload some ten bales of marijuana onto a small boat—presumably for his own gain—just prior to reaching the Brunswick River site. The government's condonation of this "skimming," they contend, is conduct so outrageous that it should bar prosecution. *See* 411 U.S. at 431–32, 93 S.Ct. at 1642–43; *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1962). The government admits that the offloading occurred, but without its knowledge or approval. Because appellants make only conclusory allegations of the government's knowledge and ap-

proval of Bailey's illegal actions, we need not consider the issue.

10. Lee Smith testified that he sold the trucks supplied by Platshorn in order to buy a shrimping vessel, "Two Bears," for use in the operation. The "Two Bears" went to sea on December 8 with Purvis and Jimmy Brown aboard to make sure that Wade Bailey connected with the mothership "Don Elias."

11. Meinster's participation in the Labor Day events was established by testimony that it was Meinster who called Purvis and told him to abandon the attempt to salvage the "Presidential's" cargo.

12. Purvis testified:
Q (By Mr. Gaskins) Well, did you have any conversations with Mr. Platshorn regarding

Other aspects of the December operation show that it was a continuation of the Labor Day plan. Rendezvous with the mothership took place at the identical location selected for the Labor Day operation, and the offloading occurred at the site hand-picked by Platshorn, Purvis and Phillips in August. Finally, Platshorn's own activities and statements [13] following the raid, though not conclusive, support the conclusion that the post-Labor Day events were part of the same criminal plan which he acted to bring about and with which he associated himself throughout.

We think this evidence is sufficient to support Platshorn's conviction under the rule set forth in *Nye & Nissen v. United States*, 336 U.S. 613, 69 S.Ct. 766, 93 L.Ed. 919 (1949):

> In order to aid and abet another to commit a crime it is necessary that a defendant "in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed." L. Hand, J. in *United States v. Peoni*, 100 F.2d 401, 402.

336 U.S. at 619, 69 S.Ct. at 769–770.

We find no merit in appellants' other contentions. Accordingly, the convictions are affirmed.

AFFIRMED.

MURNAGHAN, Circuit Judge, dissenting:

With the conclusion that the evidence sufficed to sustain the convictions on charges of importing marijuana as aiders and abettors, I am in full accord. Regrettably, however, in my judgment, the conduct of the government did not satisfy the high standards which must be maintained if due process is to be assured and as a consequence, appellants were denied the fair trial to which they were entitled.

*Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); and *Mooney v. Holohan*, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935), together mandate a two-step inquiry in the determination whether the prosecutor's acquiescence in the giving of false testimony by a government witness requires a new trial. *See Campbell v. Reed*, 594 F.2d 4, 8 (4th Cir. 1979); *United States v. Ramos Algarin*, 584 F.2d 562, 564 (1st Cir. 1978). The first inquiry looks to whether the challenged evidence is indeed sufficiently misleading under the circumstances to justify its characterization as false. *Cf. Boone v. Paderick*, 541 F.2d 447, 450 (4th Cir. 1976); *United States v. Barham*, 595 F.2d 231, 241 (5th Cir. 1979). The second inquiry, and most often that which is dispositive, is whether "'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . . .'" *Giglio, supra*, 405 U.S. at 154, 92 S.Ct. at 766, *quoting Napue, supra*, 360 U.S. at 271, 79 S.Ct. at 1178. Each should be answered in this case in a manner favorable to the appellants.

### I.

I do not share the majority's skepticism regarding the misleading character of Purvis' testimony before the jury. In addition to the testimony received by the jury which is set forth at fn. 4 of the majority opinion, Purvis also testified as follows on cross-examination:

BY MR. COGAN:

Q. I take it that the reason that you are testifying—since nobody has promised you that they are going to do any-

---

why he was not here in November or December?

A Yes, because the PRESIDENTIAL when it went aground in the Bahamas, it had attracted a lot of attention on himself. Mr. Phillips was supposed to be there also and they both felt that by their staying in Florida with everyone watching them, it would be less chance of people up here watching us.

13. Purvis testified:

"Well, [Platshorn] was upset with the fact that we were caught and made comments to the effect that if he had in fact been here himself it would not have happened—that we would not have been caught."

thing for you, nor has anyone indicated that they are going to do anything for you—that your testimony is the result of your sense of civic responsibility to the community; isn't that right?

A. I don't know if you would phrase it as a sense of civic responsibility. My reason for testifying is the fact that I was out of this country for a period of time, and when I came back from being out of the country, it made me realize exactly what the flag behind the Judge means. And that is the reason that I am testifying because I think I am paying back some past debts that I owe, that as a citizen—

Q. (Interposing) You feel that you owe a debt to the community? You owe the debt to the flag and to the community to testify; isn't that right?

A. That is correct.

Q. You feel you did an evil thing by being involved in importing marijuana; isn't that right?

A. That is correct.

Q. And your testimony before this jury is not because you feel that it may help you get more a [sic] lenient sentence, and you are not pointing the finger of guilt at anyone merely because you feel you are going to be helped—but because you feel you owe the community; isn't that right?

A. That is—

Q. (Interposing) Is that right? Yes or no? .

A. Yes.

Q. Okay, now, incidentally, there was no other factor involved in your decision to plead guilty and testify other than that; isn't that right? Your sense of obligation to the flag; is that right?

A. That is exactly right, and to pay back some debts that I owe.[1]

No doubt the promise of the prosecutor in Florida was limited to Purvis' cooperation in Florida. Nevertheless, the government has a clear duty to protect criminal defendants' due process right to a fair trial and a hypertechnical "accuracy" in the testimony of Purvis will not excuse it if its essential nature is false, devious and misleading. "The issue, of course, was whether [Purvis] figured to gain any personal benefits by [cooperating with] the Government." *United States v. Barham, supra*, 595 F.2d at 241. The "terms of the deal", Maj. op., *supra*, at 1044–1045, in Purvis' contemplation may or may not have encompassed testimony in North Carolina in addition to "cooperation" in Florida.[2] The majority decides that question in favor of the government and in conformity with the findings of the district court. However, the fact of the matter is, Purvis had not been sentenced at the time of his testimony in this case.[3] It strains credulity to suggest that Purvis, who did not testify at the post-trial hearing, at the time he testified could have honestly believed that he had fully executed his half of the deal when apparently he was no longer useful to government agents in Florida. In *Boone v. Pederick, supra*, 541 F.2d at 449, there had been a "promise of favorable treatment in return for cooperation with the prosecution." There, we noted that "a promise to recommend leniency (without assurance of it) may be interpreted by the promisee as contingent upon the quality of the evidence produced—the more uncertain the agreement, the greater the incentive to make the testimony pleasing to the promisor." *Id.* at 451. *Accord, Campbell v. Reed, supra*, 594 F.2d at 7. I am unwilling to indulge the presumption that Purvis held an honest belief that his noncooperation in

---

1. On direct examination Purvis testified in part as follows:

    Q. Is your testimony here in this courtroom today based upon any type of plea agreement or bargain with the United States or any government (sic)?

    A. No, sir.

    Q. Have you been made any promises by any agent of the United States?

    A. No, sir.

2. Purvis did testify before a Florida grand jury.

3. Purvis was sentenced subsequent to the trial in the instant case. The record does not reveal the sentence imposed. It appears that agents for the government made known to the sentencing judge the extent of Purvis' cooperation.

the North Carolina prosecutions, in the form of a refusal to testify or in the form of unhelpful testimony would have had no effect on the performance (and effectiveness) of the government's still outstanding promise to bring his cooperation to the attention of the sentencing judge in North Carolina.

In any event, I accept as correct the finding that, in the contemplation of the agent making it, the promise of a favorable representation to the judge was made in return strictly for cooperation in Florida and not for cooperation in testifying for the prosecution in North Carolina. Nevertheless, it is unrealistic to think that either the witness himself or the jury necessarily would have compartmentalized matters in that way. Rather, it is much more likely that both would have perceived a distinct possibility that, if testimony of the witness in the North Carolina case constituted an unpleasant surprise for the prosecutor, the likelihood of the favorable recommendation at sentencing time would have materially diminished. In short, the testimony relating to Purvis' motivation for testifying was sufficiently misleading under the circumstances that it was false under *Giglio*.

Nor is there in this case a serious question that the North Carolina prosecutor knew or should have known of the Florida deal. I find unacceptable the excuses for the conduct of the United States Attorney for the Eastern District of North Carolina, who had been informed by the federal authorities in Florida of the promise made to the witness of a favorable recommendation but who, nevertheless, steadfastly denied during the trial of the present case that any such promise had been made.

The fact that the North Carolina prosecutor was found by the district judge merely to have forgotten and not to have intentionally suppressed the information relates solely to the question of whether his activity was negligent or malicious. What we are concerned with are the consequences on the defendants, and they are exactly the same regardless of the North Carolina prosecutor's state of mind when he withheld the information. The Supreme Court stated in *Giglio, supra*, 405 U.S. at 154, 92 S.Ct. at 766, "whether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor." [4] Moreover, as the government conceded below, the fact that the promise was made by federal officials in Florida rather than by federal officials in North Carolina is not dispositive. *Cf. Boone v. Paderick, supra*, 541 F.2d at 450–51 (state police detective's promise imputed to state prosecutor); *United States v. Antone*, 603 F.2d 566, 570 (5th Cir. 1979) (knowledge of state investigators imputed to federal prosecutor). In *United States v. Barham, supra*, the federal prosecutor in Alabama who was prosecuting the case had been informed by an Assistant United States Attorney for the Middle District of Tennessee, who had been engaged in an overlapping investigation, that the witness had been promised that she would not be prosecuted in Tennessee if she gave truthful testimony.[5]

---

4. In *Giglio*, one Assistant United States Attorney made the promise of leniency; another who did not know it had been made, appeared at trial for the government. The failure to remember in the present case is certainly no more commendable or innocent than the failure to know what was on another prosecutor's mind in *Giglio*.

5. The circumstances in *United States v. Barham*, 595 F.2d 231 (5th Cir. 1979), where information concerning the cooperation of co-conspirators was freely exchanged between Assistant United States Attorneys in different districts, were less troubling to an observer concerned with how the government conducts its business than the lack of candor evident in the

instant case. The prosecutor in the instant case testified as follows at the post-trial hearing:

> Q. Now, in response earlier on direct examination to the question of Mr. Parsons, you said that you were told by [the federal agent in Florida] that Purvis was cooperating with him and I will not belabor this, but you said that you did not understand that and you were somewhat surprised to find out that he was cooperating with them and you had an Indictment in North Carolina.
>
> Mr. Abramson asked you some other questions about that. Do you recall also saying on direct examination that when you had your conversation with [a federal official in

In my view, it is no sufficient answer that defense counsel were assiduous enough to turn up, by inquiry to a Department of Justice official in Florida, contradictory indications on the question of whether a promise had been made. Presented with a direct conflict between statements of the Florida-based official and the North Carolina prosecutor, defense counsel had quite enough to attend to in the way of addressing the evidence to be introduced on the issues themselves rather than having to divert their attention to proving that the government official responsible for the prosecution, the one with whom they had most directly to deal in the case, was in error. His representation was the one on which they were entitled to rely, and the detriment to their clients from their doing so was the consequence.

It is true that several cases have limited the prosecutor's duty under *Napue* and *Giglio* to situations where defense counsel had absolutely no inkling before or during the trial of the truth of the existence of a deal between the prosecutor and the government's key witness. *See, e. g., United States v. Harris*, 498 F.2d 1164, 1170 (3d Cir. 1974). The question has been characterized as "troubling". *See United States v. Bynum*, 567 F.2d 1167, 1169 and fn. 1 (1st Cir. 1978) *(per curiam)*. *United States v. Barham, supra*, 595 F.2d at 243 fn. 17, establishes that the prosecutor does not automatically discharge his duty under *Giglio* simply by sharing his knowledge of a deal with defense counsel. In *Barham*, a pre-trial discovery document delivered to defense counsel contained the exact terms of the deals struck between the Assistant United States Attorney in Tennessee and three prosecution witnesses all of whom gave misleadingly false accounts of the respective agreements in response to questions on direct as well as cross-examination in the trial of a related prosecution in Alabama. Nonetheless, since the Alabama prosecutor's questions unwittingly "reinforced the deception and thereby contributed to the deprivation of due process", the court was not persuaded that defense counsel's failure to review and remember the contents of the document vitiated the duty of the prosecutor to avoid submission to the jury of tainted testimony. *Cf. United States v. Sanfilippo*, 564 F.2d 176, 178 (5th Cir. 1977) (conviction reversed and remanded for new trial on the basis of a *Giglio* violation despite the fact that "weeks before trial, the prosecutor satisfied his obligation under *Giglio* to fully disclose the terms of the plea bargain," where the prosecutor both permitted the false testimony and utilized such false testimony in closing argument).

In effect, whatever knowledge defense counsel had garnered from other sources, the primacy of the prosecutor actually en-

Florida] you really wanted to know why Purvis was cooperating.

Do you remember saying that on direct examination?

A. I think I said that and I will say it now.

Q. All right. I take it then you specifically asked [that official] the question, "Why is it that this man is cooperating with you?"

A. I do not know if I asked him that question or not.

Q. Well, you indicated that you wanted to know. Is there anything which stood in the way of your finding out?

A. Well, there was something that stood in my way of me asking him directly.

Q. What?

A. Well, you have got to understand that it is one Federal Government, but the investigation in North Carolina was not exactly— well, a better way to put it was that there may be conflicts between the investigation in North Carolina and the one in Florida.

Just because somebody—the Federal Government in Florida is investigating one person, it does not mean that there is also complete cooperation because there is a certain sense of competition. You do not always tell what is going on in one District to another District.

That is a fact of life. For that reason, I would not come out and say, "Chuck, what is happening down there," or something of that nature. I would find out in a more indirect fashion.

Q. Are you saying that it is a fact of prosecutorial life in this country in the Justice Department, that there is competition between arms of the Federal Government in terms of criminal investigations and prosecutions?

Is that the gist of what you are saying?

A. I will just have to stand on my other statement.

gaged in the case as a source was so great that his flat and reiterated denial left the defendants and their counsel "without an inkling" of the deal between Purvis and the federal authorities in Florida.

## II.

Accordingly, *Giglio* and *Napue* principles apply to this case. The dispositive issue is whether the false testimony "could . . in any reasonable likelihood have affected the judgment of the jury." This standard of review has been described as a "low threshold". *Barham, supra*, 595 F.2d at 242. The standard is:

> [A] brother, if not a twin, of the standard ("harmless beyond a reasonable doubt") for determining whether constitutional error can be held harmless. *See Chapman v. California*, 1967, 386 U.S. 18, 23–24, 87 S.Ct. 824, 17 L.Ed.2d 705. A strict standard is appropriate because, as the Supreme Court has explained, false testimony cases involve not only "prosecutorial misconduct", but also "a corruption of the truth-seeking function of the trial process", *United States v. Agurs, supra*, 427 U.S. at 104, 96 S.Ct. at 2397.

*Id.* The inquiry into "reasonable likelihood" is "not an easy one". *Boone v. Paderick, supra*, 541 F.2d at 453. However, it is certain that appellants need *not* show on appeal that disclosure "would have created a reasonable doubt that did not otherwise exist. . . ." *See United States v. Sutton*, 542 F.2d 1239, 1242 and fn. 3 (4th Cir. 1976). In *Campbell v. Reed*, 594 F.2d 4, 8 (4th Cir. 1979), the defendant had confessed to committing the crime charged although he denied at trial that the confession was voluntarily given. Despite the confession and independent testimony apparently corroborative of the noncoercive circumstances surrounding its procurement, absent the prosecutor's disclosure of a plea agreement favorable to the key witness for the state, the court declined to hold that the jury's judgment surely would have been unaffected.

Here, Purvis' testimony was immeasurably crucial to the government's case

against appellants. It must be recalled that appellants were charged solely as aiders and abettors; the case was tried as a conspiracy prosecution although the conspiracy count in the indictment was dismissed prior to trial. It was the government's theory that appellants were the "money men" behind a large-scale conspiracy to import marijuana into North Carolina. Purvis' testimony initially and directly tied each of the appellants to the conspiracy as its moving force. Under the government's theory of the case, Purvis was the North Carolina lieutenant who alone among the witnesses at trial maintained direct and continuing contact with appellants. Essentially, the government's case rested upon its showing that certain trips to North Carolina by each of the appellants, together with Purvis' inculpatory narrative, constituted evidence of appellants' respective involvement in the conspiracy. Appellants did not dispute the fact of those trips to North Carolina but, rather, asserted, through the live testimony of others and in argument, that the trips were made in pursuit of legitimate business interests.

Lee Smith's testimony corroborating some of the testimony of Purvis related to a period of time later in the course of the conspiracy. It is doubtful that Smith's testimony could, in the manner in which the government put on its case, stand on its own. Nor is the assertion lightly to be disregarded that the relationship between Purvis and Smith, who were good friends, the latter having been recruited for service in the venture by the former, might well have led to the jury's discounting of Smith's testimony. In a similar vein, the documentary evidence adduced at trial, consisting primarily of telephone toll records, hotel folios and airline flight records, all rely for their probativeness upon jury acceptance of the testimony of Purvis and of Smith.

In summary, the prosecution put on a compelling case against appellants; however, particularly in view of other issues in the case, it was the credibility of Purvis upon which the strength of the entire case

depended.[6] Despite defense counsel's attack on the credibility of the key witness, in the face of Purvis' denial and of the continued denial by the prosecutor of the existence of *any* promise to Purvis the jury necessarily perceived that in large measure the attack was speculative at best. *See Boone v. Paderick, supra,* 541 F.2d at 451. It should be recalled, as well, that the prosecutor's failure to correct the false impression given by Purvis' denial of any promises "shielded from jury consideration yet another, more persuasive reason to doubt [his] testimony—the very fact that [he] had attempted to give the jury a false impression concerning [a promise] from the Government." *United States v. Barham, supra,* 595 F.2d at 243.

Reversal here would comply with the spirit of *Giglio:*

> There is no doubt that the evidence in this case was sufficient to support a verdict of guilty. But the fact that we would sustain a conviction untainted by the false evidence is not the question. After all, we are not the body which, under the Constitution, is given the responsibility of deciding guilt or innocence. The jury is that body, and, again under the Constitution, the defendant[s] [are] entitled to a jury that is not laboring under a Government-sanctioned false impression of material evidence when it decides the question of guilt or innocence with all its ramifications.

*United States v. Barham,* 595 F.2d at 242.

Accordingly, I dissent.

---

**6.** During a bench conference related to jury instructions, the district court pointed out:

> As I view the evidence, Platshorn, whatever his contribution by way of money and so forth were, if you believe this Purvis, they continued. You could trace his involvement in what actually finally happened right back to the first thing that he ever did. . . .

Those comments were made in response to a contention by counsel for Platshorn that Platshorn's alleged involvement in the conspiracy terminated with the aborted importation planned for Labor Day weekend. As the district court correctly observed, it was Purvis' testimony which demonstrated rather conclusively that the scheme to import marijuana into North Carolina was a single continuing scheme.