Affirmed in part, vacated in part, and remanded by published opinion. Judge MOTZ wrote the opinion, in which Chief Judge TRAXLER concurs as to Parts III., IV.A, and V. and dissents as to Parts II. and IV.B., and Judge WYNN concurs, except for Part III. Chief Judge TRAXLER and Judge WYNN each wrote a separate opinion concurring in part and dissenting in part.
DIANA GRIBBON MOTZ, Circuit Judge:
James Owens brought this action under 42 U.S.C. § 1983 against the Baltimore City State’s Attorney’s Office, an assistant State’s Attorney, the Baltimore City Police Department, and several Baltimore City police officers. In his complaint, Owens alleges that the defendants violated his constitutional rights by intentionally withholding exculpatory evidence during his 1988 trial for the rape and murder of Colleen Williar. The district court dismissed the complaint in its entirety against all defendants on statute-of-limitations grounds. In the alternative, the court held that the Baltimore City State’s Attorney’s Office enjoyed sovereign immunity, the individual police officers enjoyed qualified immunity, and Owens’s cause of action against the Baltimore City Police Department failed to state a claim on which relief could be granted. For the reasons that follow, we affirm in part, vacate in part, and remand the case for further proceedings consistent with this opinion.
I.
Owens appeals the dismissal of his complaint for failure to state a claim. Accordingly, we recount the facts as alleged by Owens in his complaint, accepting as true all well-pleaded facts. See Minor v. Bostwick Labs., Inc., 669 F.3d 428, 430 n. 1 (4th Cir.2012).
A.
In the early morning hours of August 2, 1987, Colleen Williar was raped, robbed, and murdered in the second-floor bedroom of her Baltimore City apartment. The following day, one of Williar’s neighbors, James Thompson, contacted the city police department to inquire about a reward it had offered for information relating to Ms. Williar’s death. Thompson claimed that he had found a knife outside of Ms. Will-iar’s apartment the previous evening, which he had carried home and cleaned before realizing its connection to the crime. Over the course of Thompson’s conversation with police, however, it became apparent that Thompson had not simply “happened” on the knife, as he originally claimed. Rather, in response to questioning from Officers Thomas Pelligri-ni, Gary Dunnigan, and Jay Landsman (collectively, “the Officers”), Thompson asserted that he had retrieved the knife at the behest of his friend, James Owens. The Officers executed a search warrant at Owens’s apartment, but found no physical evidence linking Owens to the crime. Even though the search was fruitless, police arrested Owens on the basis of Thompson’s statement. A grand jury then indicted Owens for Ms. Williar’s murder, rape, and burglary.
On the eve of Owens’s trial, Assistant State’s Attorney (“ASA”) Marvin Brave, the prosecutor assigned to Owens’s case, *386 began to question the veracity of Thompson’s version of events. When ASA Brave raised these concerns with Thompson, the witness retracted his statement and offered another explanation for the knife’s acquisition. This time, Thompson stated that the knife belonged to him, but he claimed that it had gone missing after Owens visited Thompson at his home. The day after Ms. Williar’s murder, Owens assertedly returned the knife to Thompson, who noticed blood on the weapon’s blade and handle. When Thompson questioned Owens about the origin of the blood, Owens denied using the weapon and told Thompson to keep quiet about it.
At trial, ASA Brave presented only this third version of events to the jury. Brave never informed defense counsel about Thompson’s earlier accounts, and thus, when cross-examining Thompson, defense counsel was unaware that the witness had changed his story several times over the course of the investigation.
Nevertheless, defense counsel apparently cast enough doubt on Thompson’s testimony to prompt ASA Brave to seek out additional evidence of Owens’s guilt. To this end, mid-trial, ASA Brave ordered testing of a pubic hair found on Ms. Will-iar’s body. When the results were returned, however, they indicated that Thompson—not Owens—matched the sample. Concerned that Thompson was involved in the crimes, ASA Brave instructed the Officers to reinterrogate Thompson.
At ASA Brave’s direction, Officers Pelli-grini, Dunnigan, and Landsman brought Thompson into the stationhouse and questioned him for two hours. The Officers accused Thompson of lying on the witness stand, warned him that he “was in a lot of trouble,” and asserted that he could be charged with a crime for his misrepresentations to the jury. After receiving their warnings, Thompson stated that he wanted to change his story yet again. In fact, over the course of the two-hour interview, Thompson changed his story five additional times.
In his first new attempt, Thompson told the Officers that he and Owens had broken into Ms. Williar’s apartment on the day of the murder only to find Ms. Williar already dead in her bedroom. When the Officers replied that they did not believe him, Thompson offered another iteration. This time, he contended that Owens had raped and murdered Ms. Williar upstairs while Thompson waited downstairs in the living room. The Officers responded that there was evidence that Thompson had been on the second floor, and thus, his amended account could not be true. After this prompt, Thompson admitted that he had been on the second floor, but insisted that he had hidden in the bathroom during Owens’s crimes. The Officers again rejected Thompson’s story, stating that investigators had found physical evidence of Thompson’s presence in Ms. Williar’s bedroom. In response, Thompson admitted that he had been in the bedroom while Owens raped and killed Ms. Williar, but he insisted that he had refused to participate in any assault. At this point, the Officers informed Thompson that his pubic hair had been found on Ms. Williar. Faced with the forensic evidence, Thompson offered a fifth version of events. In this account, Thompson claimed that he and Owens had broken into Ms. Williar’s apartment with the intent to steal her jewelry. When the pair found the victim alone in her bedroom, Owens raped and killed her, while Thompson masturbated at the foot of her bed.
After the Officers elicited this latest account, Officer Landsman told ASA Brave about Thompson’s final version of events. None of the Officers disclosed that Thompson had offered several other accounts of *387 what happened, all of which differed dramatically from the version of events related to ASA Brave as well as from the physical evidence.
Following his conversation with the Officers, ASA Brave immediately called Thompson back to the witness stand and had him share with the jury his new account of what happened. However, because only the Officers knew of the inconsistencies in Thompson’s statements, neither ASA Brave nor defense counsel questioned Thompson about the four inconsistent versions of the story that the witness had offered before he settled on his final account. Moreover, neither ASA Brave nor the Officers told defense counsel about the discovery of Thompson’s pubic hair. Indeed, when defense counsel inquired about whether there had been forensic testing of the hair, ASA Brave represented to the court that “there [hadn’t] been any match made” between the sample and a suspect.[1]
The jury convicted Owens of burglary and felony murder, and the trial court sentenced him to life imprisonment without the possibility of parole. Owens filed an unsuccessful appeal, and, over the course of the next two decades, several unsuccessful state-court petitions for post-conviction relief. In 2006, however, a state court granted Owens’s request for post-conviction DNA testing. The results were returned some months later and indicated that Owens’s DNA did not match the blood and semen evidence found at the scene of the crime.
On June 4, 2007, a state court granted Owens’s “petition to reopen his Post Conviction Proceeding” and ordered that “by agreement of Counsel and this Honorable Court, ... Petitioner shall be granted a new trial.” During the next sixteen months, Owens remained in state prison awaiting retrial. On October 15, 2008, the State’s Attorney entered a nolle prosequi, dropping the charges against him. On that date, after Owens had spent more than twenty years in prison, the state court ordered him released from incarceration.
B.
On October 12, 2011, a few days before the three-year anniversary of the nolle prosequi, Owens filed this action under 42 U.S.C. § 1988 against the Mayor and City Council of Baltimore, the Baltimore City State’s Attorney’s Office, ASA Brave, the Baltimore City Police Department (“BCPD”), and Officers Pelligrini, Dunni-gan, and Landsman. In his complaint, Owens alleges that the defendants violated his constitutional rights by intentionally and in bad faith withholding exculpatory and impeachment evidence at his 1988 trial.
All defendants moved to dismiss the complaint. The Baltimore City State’s Attorney’s Office asserted that it was not an entity amenable to suit, and that even if it were, it was an “arm of the State,” immune from liability. The individual Officers, the BCPD, and ASA Brave all moved to dismiss on statute-of-limitations grounds. Alternatively, the individual Officers asserted that qualified immunity protected them from suit, and the BCPD *388 maintained that Owens failed to state a claim on which relief could be granted.
After Owens voluntarily dismissed the claims against the Mayor and City Council of Baltimore, the district court, in an oral ruling, dismissed the claims against the other defendants. The court initially determined that Owens’s claims were time barred because the limitations period for his causes of action commenced when the state court granted Owens’s request for a new trial, not (as Owens claimed) on the date that prosecutors entered the nolle prosequi. Although the limitations issue disposed of all of Owens’s claims, the court went on to briefly address the defendants’ alternative grounds for dismissal. In a series of rulings, the court determined that the Baltimore City State’s Attorney’s Office was entitled to sovereign immunity, that the individual Officers and the BCPD were entitled to qualified immunity, and that Owens’s complaint failed to state a claim against the BCPD. Owens noted a timely appeal.
We review a district court’s grant of a motion to dismiss de novo. Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir.1993). At this stage in the proceedings, we “accept as true all of the factual allegations contained in the complaint,” and “draw all reasonable inferences in favor of the plaintiff.” E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 440 (4th Cir.2011). To prevail, Owens must “state a claim to relief that is plausible on its face.” Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (emphasis added and internal quotation marks omitted). A claim has “facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.” Id.
II.
We first consider whether the applicable statute of limitations bars all of Owens’s claims.
Section 1983 does not contain a statute of limitations. Thus, to determine the timely filing of a § 1983 claim, courts borrow the statute of limitations from the most analogous state-law cause of action. See 42 U.S.C. § 1988(a). For § 1983 suits, that cause of action is a personal-injury suit. See Owens v. Okure, 488 U.S. 235, 249-50, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989). Maryland law affords plaintiffs three years to file a personal-injury action. See Md.Code Ann., Cts. & Jud. Proc. § 5-101. Hence, a three-year limitations period applies to Owens’s claims.
The parties agree that Owens had three years to file his § 1983 action. They disagree, however, as to the date on which this three-year limitations period began to run. Appellees contend that the three-year clock on Owens’s claims began to run on June 4, 2007, the date on which the state court vacated his conviction and granted him a new trial. Appellees’ Br. 24. Because Owens filed suit more than three years after this date (on October 12, 2011), the Appellees maintain that all of Owens’s claims are time barred. Id. Owens, by contrast, maintains that the statute of limitations for his claims did not begin to run until October 15, 2008—the date on which prosecutors filed a nolle prosequi, finally resolving the proceedings against him. Appellant’s Br. 22. Because he filed suit within three years of this date, Owens contends that he met the operative deadline.
Although state law determines the applicable statute of limitations for § 1983 claims, federal law governs the date on which that limitations period begins to run. Wallace v. Koto, 549 U.S. *389 384, 388, 127 S.Ct. 1091, 166 L.Ed.2d 973 (2007). Federal law, in turn, “conform[s] ... to common-law tort principles” for purposes of determining this date. Id. “Under those principles, it is the standard rule that accrual occurs when the plaintiff has a complete and present cause of action” against a defendant—that is, when the plaintiff knows or has reason to know of his injury. Id. (internal quotation marks and brackets omitted).
In Wallace, however, the Supreme Court recognized that limitations on common-law torts do not always begin on the date that a plaintiff knows or has reason to know of his injury. Wallace, 549 U.S. at 388, 127 S.Ct. 1091. Accordingly, it found that the “standard rule” does not always control the start of the limitations period for a § 1983 claim. Id.; see also Devbrow v. Kalu, 705 F.3d 765, 767 (7th Cir.2013) (relying on Wallace to hold that there is no “single accrual rule for all § 1983 claims”).
Instead, the Wallace Court held that to determine the date of accrual for a particular § 1983 claim, a court must look to the common-law tort that is most analogous to the plaintiffs § 1983 claim and determine the date on which the limitations period for this most analogous tort claim would begin to run. Id.; see also Varnell v. Dora Consol. Sch. Dist., 756 F.3d 1208 (10th Cir.2014) (noting that “[f]ollowing Wallace, we determine the accrual date of Plaintiffs claim by looking to the accrual date for the common-law tort most analogous to her § 1983 claim”); Devbrow, 705 F.3d at 767 (holding that a court “use[s] the [accrual] rule that applies to the common-law cause of action most similar to the kind of claim the plaintiff asserts”). For most common-law torts, a plaintiffs cause of action accrues, and the limitations period commences, when the plaintiff knows or has reason to know of his injury (hence, the “standard rule”). But if the common law provides a “distinctive rule” for determining when the limitations period for a particular tort begins to run, a court must “consider[ ]” this “refinement” in determining when the limitations period for the plaintiffs analogous claim under § 1983 should commence. Wallace, 549 U.S. at 388,127 S.Ct. 1091.
In Wallace, the Supreme Court addressed a § 1983 claim alleging an unconstitutional detention by police officers. 549 U.S. at 388,127 S.Ct. 1091. The Court recognized the “standard rule” for accrual, but because it found the tort of false imprisonment to be the tort most analogous to the plaintiffs § 1983 claim, it considered the “common law’s distinctive treatment” of that tort in determining the start of the limitations period for the plaintiffs § 1983 claim. Id.
The Court noted that Wallace could have brought his claim under § 1983 “immediately upon his false arrest.” Id. at 390 n. 3, 127 S.Ct. 1091. This was so because Wallace’s injury commenced at that date, and “a person falsely imprisoned has the right to sue on the first day of his detention.” Id. (citation omitted). The Supreme Court went on to explain, however, that under the common law, the statute of limitations for false imprisonment does not begin to run at the outset of a plaintiffs false imprisonment; rather, limitations begin to run only at the end of a plaintiffs false imprisonment. Id. at 389, 127 S.Ct. 1091. Deferring to the common law’s “distinctive rule,” the Court selected the date on which Wallace’s false imprisonment ended—not the date on which it began—as the start of the operative limitations period. Id. at 391-92,127 S.Ct. 1091. With this start date established, the Court held that Wallace’s § 1983 claim accrued on the date that he was arraigned by a magistrate, i.e., the date on which his false imprisonment ended. Id.
*390 Here, the parties acknowledge that, unlike in Wallace, false imprisonment is not the tort “most analogous” to Owens’s § 1983 claims. Instead, they properly agree that the tort of malicious prosecution, which the Wallace Court recognized as an “entirely distinct” tort, provides the closest analogy to Owens’s Brady-like claim. See Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Malicious prosecution redresses injuries a plaintiff sustains as a result of a defendant’s improper initiation or maintenance of formal proceedings against him. See Lambert v. Williams, 223 F.3d 257, 260 (4th Cir.2000). Because Owens contends that the Appellees violated due process by maintaining proceedings against him without disclosing exculpatory evidence, malicious prosecution provides the closest analogy to his § 1983 claims. Thus, following Wallace, we must determine the start date of Owens’s § 1983 claims by looking to the start date of the common-law tort most analogous to his claims—here, malicious prosecution.
Under the common law, the limitations period for a plaintiffs malicious prosecution claim commences when the proceedings brought against him are resolved in his favor. W. Page Keeton, et al., Prosser & Keeton on Torts § 119 (5th ed.1984); see also 3 Dan B. Dobbs, et al., The Law of Torts § 590 (2d ed.2011); 8 Stuart M. Speiser, et al., The American Law of Torts § 28.5 (2011); 1 Fowler V. Harper, et al., Harper, James, and Gray on Torts § 4.4 (3d ed. rev.2006). To satisfy this favorable-termination requirement, a plaintiff must show that the proceedings against him were favorably terminated “in such manner that [they] cannot be revived.” Keeton, et al. at § 119. “This is true, for example, of an acquittal in court, a discharge ... upon preliminary hearing, [or] the entry of a nolle prosequi.” Id.; see also Speiser, et al. at § 28.5; Harper, et al. at § 4.4. It is not true of “[a]ny disposition of the criminal action which does not terminate it but permits it to be renewed.” Keeton, et al. at § 119 (emphasis added). Under the common law, such terminations “cannot serve as the foundation for [a malicious prosecution] action,” and thus, the limitations period for malicious prosecution claims does not begin to run until a truly final disposition is achieved. Id.
The grant of a new trial does not terminate the proceedings against a defendant “in such a manner that [they] cannot be revived.” Keeton, et al. at § 119. Rather, it provides a procedural victory, which simply postpones the proceedings’ ultimate outcome. See Harper, et al. at § 4.4 (“The termination in the plaintiffs favor must be a final one, and if the proceedings are immediately renewed for the same offense, they are sufficient to bar plaintiffs action for malicious prosecution until they are finally determined.”).
Because the grant of a new trial does not trigger the limitations period for a malicious prosecution claim, the statute of limitations on Owens’s § 1983 claims did not begin to run on the date he was granted a new trial. Instead, the operative limitations period began to run on the date a malicious prosecution claim became ripe at common law, i.e., the date on which the nolle prosequi was entered. It was only on this date that proceedings against Owens were favorably terminated in such manner that they could not be revived. Because Owens filed suit within three years of this date, the statute of limitations does not bar his present cause of action.[2]
*391 Contrary to the Appellees’ suggestion, Heck v. Humphrey, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), does not require a different result. Heck held that a prisoner may not file suit under § 1983 as long as a § 1983 judgment in his favor would imply the invalidity of his criminal conviction. See id. at 487, 114 S.Ct. 2364. In this case, as the Appellees point out, the Heck bar to suit was removed as soon as the state court invalidated Owens’s conviction and granted him a new trial. But contrary to the Appellees’ contention, removal of the Heck bar did not compel Owens immediately to proceed under § 1983. This is so because the statute of limitations for the most analogous common-law tort, malicious prosecution, did not begin to run until the proceedings against Owens were finally terminated in his favor and could not “be revived, ” Keeton, et al. at § 119, i.e., when the prosecutor filed the nolle prosequi. Up until this point, Owens remained imprisoned, and the prosecutor could—and for sixteen months did—proceed against him without the need to seek reindictment.
The partial dissent recognizes that Heck does not resolve the statute-of-limitations issue before us. It nonetheless maintains that Owens’s claims are time barred because, in the dissent’s view, the statute of limitations on Owens’s § 1983 claims began to run when he was granted a new trial, or when he possessed sufficient facts to know about the Appellees’ illegal suppression of evidence, i.e., whenever Owens could have brought his Brady-like claim.
The dissent both acknowledges that, in determining the start date of Owens’s § 1983 claims, a court must look to malicious prosecution as the closest “common law analogue,” and recognizes that the date of favorable termination is the date triggering the onset of limitations for a malicious prosecution claim. But the dissent maintains that we adhere too closely to the malicious prosecution analogue. In the dissent’s view, a court should consider the “underlying purpose of the elements of the common law analogue” and borrow this onset date for a § 1983 claim only if doing so would serve that underlying purpose. Because the dissent concludes that borrowing the onset date for malicious prosecution would not serve this underlying purpose, it believes we should not borrow its onset date here.
We recognize the important distinctions between malicious prosecution torts and Owens’s Brady-like claims. But we cannot agree with the dissent that those distinctions somehow permit us to jettison the common law date on which limitations begin to run in determining the date on which limitations begin to ran for an analogous § 1983 claim. Neither precedent nor logic permits this result.
The common law does act as a mere “starting point” in “defining the elements of damages and the prerequisites for their recovery” under § 1983. Carey v. Piphus, 435 U.S. 247, 257-58, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978) (emphasis added). But the dissent cites no case in which the Supreme Court has used the common law as merely the “starting point” in resolving a statute-of-limitations question in a § 1983 action. This is so because the *392 Court has never sanctioned such an approach. Rather, in resolving the precise question at issue here—when the statute of limitations for a § 1988 claim begins to run—the Wallace Court applied the distinctive common law rule for the most analogous tort. 549 U.S. at 888-89, 127 S.Ct. 1091 (“[T]o determine the beginning of the limitations period in this [§ 1983] case, we must determine when petitioner’s false imprisonment came to an end.”). Moreover, in Heck, the majority expressly relied on malicious prosecution’s favorable termination requirement to delay the accrual of the plaintiffs Brady-based § 1983 claim. Heck, 512 U.S. at 484, 114 S.Ct. 2364.[3] That the Supreme Court would require courts to analogize to the tort of malicious prosecution for purposes of delaying the onset of a Brady claim, yet eschew the very same analogy for purposes of calculating the onset of limitations for a Brady claim, strikes us as exceedingly unlikely. Accordingly, we cannot endorse the partial dissent’s analysis.
Furthermore, even if, as the dissent argues, a court should consider the policy and “underlying purpose of the elements of the common law analogue” to determine when the statute of limitations begins to run, we would reach the same result. For the “strong judicial policy against the creation of conflicting resolutions arising out of the same or identical transaction” furthered by malicious prosecution’s favorable termination requirement, Heck, 512 U.S. at 484, 114 S.Ct. 2364, is also implicated in the Brady context. By setting different dates for the beginning of the limitations period for a claimant’s § 1983 Brady claim on the one hand, and his malicious prosecution claim on the other, the dissent would permit a claimant to bring a state claim (based on the same conduct) long after the time for bringing the § 1983 claim had expired. The limitations period on the § 1983 claim might even have run before the state claim ever ripened, forcing a claimant to bring separate actions that could produce different and potentially conflicting results. Thus the dissent’s approach would hardly accord with the “strong judicial policy against the creation of conflicting resolutions.” Id.
In sum, we take the Supreme Court at its word. We determine when the statute of limitations on a plaintiffs § 1983 claim begins to run by looking to the common-law tort most analogous to the plaintiffs claim. In general, the limitations period for common law torts commences when the plaintiff knows or has reason to know of his injury. But if the common law provides a “distinctive rule” for determining the start date of the limitations period for the analogous tort, a court should consider this rule in determining when the limitations period for the plaintiffs claim begins to run. Wallace, 549 U.S. at 388-89, 127 S.Ct. 1091. Application of this rule to Owens’s claims sets the start of the limitations period at the date of the nolle prose-qui. Because Owens filed suit within three years of this date, his claims were timely filed.
III.
Even if Owens’s suit is timely, the Baltimore City State’s Attorney’s Office contends that the suit must be dismissed *393 as to it because it is not an entity capable of being sued.[4]
The Federal Rules of Civil Procedure provide that the law of the state in which the district court sits determines an entity’s capacity to be sued. Fed.R.Civ.P. 17(b). Maryland courts have had no occasion to address whether the Baltimore City State’s Attorney’s Office may be sued. But Maryland courts’ treatment of analogous agencies confirms that the “Baltimore City State’s Attorney’s Office” is not a suable entity.
In Boyer v. State, Maryland’s highest court made clear that, absent a statutory or constitutional provision creating a government agency, an “office” or “department” bears no unique legal identity, and thus, it cannot be sued under Maryland law. See 323 Md. 558, 594 A.2d 121, 128 n. 9 (1991). In Boyer, the court considered whether the “Charles County Sheriffs Department” was an entity amenable to suit. Id. It concluded:
We are unaware of any statute, public general or public local, establishing an entity known as the Charles County “Sheriffs Department.” The sheriff for each county is a constitutional officer under Art. IV, § 44, of the Constitution of Maryland. [But] [n]either the Constitution nor any other provision of law creates a governmental agency knoum as the “Sheriff’s Department.” Consequently, the motion for summary judgment on behalf of the Charles County ‘Sheriffs Department’ correctly asserted that the ‘Sheriffs Department’ is not an entity capable of being sued.
Id. (emphasis added).
Like the “Sheriffs Department” at issue in Boyer, no constitutional or statutory provision establishes a “Baltimore City State’s Attorney’s Office.” The “State’s Attorney” for each county and Baltimore City is a constitutional officer, but Maryland law creates no “State’s Attorney’s Office.” Cf. Md. Const, art. V, § 7 (“There shall be an Attorney for the State in each county and the City of Baltimore, to be styled ‘the State’s Attorney.’ ”); Md. Ann.Code, Crim. Proc. § 15-102 (“[A] State’s Attorney shall, in the county served by the State’s Attorney, prosecute and defend on the part of the State all cases in which the State may be interested.”).
Indeed, Maryland law delegates many of the functions a hypothetical “State’s Attorney’s Office” would perform to a separate “Office of the State’s Attorney’s Coordinator.” See id. § 15-302 (describing the functions of the Office of the State’s Attorney’s Coordinator, including training each State’s Attorney’s professional staff and performing legal research). Unlike the “Baltimore City State’s Attorney’s Office,” the “Office of the State’s Attorney’s Coordinator” is expressly created by statute. See id. § 15-301(a)(l) (“There is an office of State’s Attorney’s Coordinator.”). That the Maryland General Assembly knew how to create such an office, yet failed to do so with respect to the “entity” here, confirms that the “Baltimore City State’s Attorney’s *394 Office” bears no unique legal identity. Cf. Sosa v. Alvarez-Machain, 542 U.S. 692, 711 n. 9, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004) (“[W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended.” (internal quotation marks omitted)).
Owens notes that Title 15 of the Maryland Code of Criminal Procedure, which establishes the duties of a State’s Attorney, is entitled “Office of the State’s Attorney.” Based on this title, Owens contends that the Maryland General Assembly has established a “State’s Attorney’s Office,” which may be sued under Maryland law. Reply Br. at 2. This argument fails, however, for two reasons. First, as the Supreme Court has long held, a statute’s title provides little assistance to courts interpreting statutory provisions. See, e.g., Bhd. of R.R. Trainmen v. Balt. & Ohio R.R. Co., 331 U.S. 519, 528-29, 67 S.Ct. 1387, 91 L.Ed. 1646 (1947) (“[T]he title of the statute and the heading of a section cannot limit the plain meaning of the text. For interpretive purposes, they are of use only when they shed light on some ambiguous word or phrase.”). Second, even if we were to consider the title heading, it is clear that the title refers to the position of the State’s Attorney, not a separate, suable office. Undoubtedly, a plaintiff may sue the State’s Attorney, i.e., the person who holds the position. See S.C. State Ports Auth. v. Fed. Mar. Comm’n, 243 F.3d 165, 170 (4th Cir.2001) (“[S]tate officers may be sued for money damages in their individual capacities, so long as relief is sought from the officer personally.”), aff'd, 535 U.S. 743, 122 S.Ct. 1864, 152 L.Ed.2d 962 (2002). But the heading fails to establish the legal identity—and thus the suability—of a “State’s Attorney’s Office,” separate and apart from the person who occupies the position or office.
Our friend’s partial dissent suggests that the Maryland Constitution creates a “Baltimore City State’s Attorney’s Office” amenable to suit under Maryland law. But, in fact, nearly every provision of law cited for this proposition regulates the State’s Attorney, not a State’s Attorney’s Office. See, e.g., Md. Const, art. V, § 9 (“The State’s Attorney shall perform such duties and receive such salary as shall be prescribed by the General Assembly.” (emphasis added)); id. (“[T]he State’s Attorney for Baltimore City shall have the power to appoint a Deputy and such other Assistants as the Supreme Judicial Bench of Baltimore City may authorize or ap-prove____” (emphasis added)); see also Md.Code Ann., Crim. Proc. § 15-102 (“[A] State’s Attorney shall, in the county served by the State’s Attorney, prosecute and defend on the part of the State all eases in which the State may be interested.” (emphasis added)). Far from establishing a State’s Attorney’s Office, these provisions create and administer the position of State’s Attorney—a position Owens could have reached, but did not, by suing the Baltimore City State’s Attorney in his individual or official capacity.
To be sure, close inspection of Maryland’s Constitution does reveal a passing reference to “the office of the State’s Attorney.” Md. Const, art. V, § 9 (“[Expenses for conducting the office of the State’s Attorney ... shall be paid by the Mayor and City Council of Baltimore to the extent that the total of them exceeds the fees of his office.”). But this passing reference to an “office” seems to us nothing more than shorthand for the position of State’s Attorney. Moreover, the reference fails to distinguish the case at hand from Boyer. For there, although the Maryland Code made a passing reference to *395 the Charles County “Sheriffs department,” Maryland’s highest court held that Maryland law failed to “establish[ ] an entity known as the Charles County ‘Sheriffs Department.’ ” 594 A.2d at 128 n. 9; see Md.Code Ann., Local Gov’t § 12—208(b)(1) (formerly Md.Code, art. 25, § 3) (“The County Commissioners of Charles County shall establish a separate pension plan for sworn employees of the Charles County Sheriffs department____” (emphasis added)). To remain faithful to the court’s analysis in Boyer, we must similarly hold that the “Baltimore City State’s Attorney’s Office” is not a suable entity.
In conclusion, we hold that the “Baltimore City State’s Attorney’s Office” is a term of convenience only. It refers to the collection of government employees who work under the supervision of the Baltimore City State’s Attorney. It is not an entity amenable to suit.[5]
IV.
We next consider the qualified-immunity defense asserted by Officers Pelligrini, Dunnigan, and Landsman.
Qualified immunity protects government officials from liability for “civil damages insofar as their conduct does not violate clearly established ... rights of which a reasonable person would have known.” Harlow, 457 U.S. at 818, 102 S.Ct. 2727. The doctrine is designed to square two important interests: “the need to hold public officials accountable when they exercise [their] power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.” Pearson v. Callahan, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).
Qualified immunity protects public officials from suit when the state of the law is such that they would not have known that their conduct violates statutory or constitutional rights. Ashcroft v. al-Kidd, — U.S. -, 131 S.Ct. 2074, 2083, 179 L.Ed.2d 1149 (2011). See, e.g., Pinder v. Johnson, 54 F.3d 1169, 1177-78 (4th Cir. 1995) (en banc). The defense does not shield officials, however, when they have acted “incompetently]” or have “knowingly violate[d] the law.” Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). See, e.g., Occupy Columbia v. Haley, 738 F.3d 107, 125 (4th Cir.2013); Brockington v. Boykins, 637 F.3d 503, 507-08 (4th Cir.2011); Ridpath v. Bd. of Governors Marshall Univ., 447 F.3d 292, 321 (4th Cir.2006).
To establish a qualified-immunity defense, a public official must demonstrate that (1) a plaintiff has not alleged or shown facts that “make out a violation of a constitutional right,” or that (2) “the right at *396 issue was [not] ‘clearly established’ at the time of’ its alleged violation. Pearson, 555 U.S. at 232, 129 S.Ct. 808.
A qualified immunity defense can be presented in a Rule 12(b)(6) motion, but, as the Second Circuit has noted, when asserted at this early stage in the proceedings, “the defense faces a formidable hurdle” and “is usually not successful.” Field Day, LLC v. Cnty. of Suffolk, 463 F.3d 167, 191-92 (2d Cir.2006). This is so because dismissal under Rule 12(b)(6) is appropriate only if a plaintiff fails to state a claim that is plausible on its face. Iqbal, 556 U.S. at 678, 129 S.Ct. 1937. A claim has “facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.” Id. To satisfy the standard, a plaintiff must do more than allege facts that show the “sheer possibility” of wrongdoing. Id. The plaintiffs complaint will not be dismissed as long as he provides sufficient detail about his claim to show that he has a more-than-conceivable chance of success on the merits. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L,Ed.2d 929 (2006).
On the one hand, Owens alleges that Officers PeUigrini, Dunnigan, and Landsman violated his clearly established constitutional rights by acting in bad faith to suppress material evidence supporting his innocence. On the other hand, the Officers maintain, and the district court held, that Owens has not pled a plausible claim, Appellees’ Br. at 41-42, and that even if he has, the rights he asserts were not clearly established in 1988—the date of their alleged violation, id. at 29^40. We address each argument in turn.
A.
In 1963, the Supreme Court held in Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), that prosecutors’ suppression of evidence “favorable to an accused” violates the Due Process Clause when the evidence proves “material either to guilt or to punishment.” A year after Brady, we concluded that police officers’ suppression of evidence also violates the Constitution. See Barbee v. Warden, Md. Penitentiary, 331 F.2d 842, 846-47 (4th Cir.1964). Specifically, in Bar-bee, we found that a police officer’s failure to disclose exculpatory evidence to a prosecutor violates a defendant’s due process rights. Id. at 847. “It makes no [constitutional] difference,” we explained, “if the withholding [of evidence] is by officials other than the prosecutor. The police are also part of the prosecution and the taint on the trial is no less if they, rather than the State’s Attorney, were guilty of the nondisclosure.” Id. at 846; see also Strickler v. Greene, 527 U.S. 263, 280-81, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) {“[Brady ] encompasses evidence known only to police investigators and not to the prosecutor.” (internal quotation marks omitted)). In Goodwin v. Metts, 885 F.2d 157, 163-64 (4th Cir.1989), we reaffirmed our Barbee decision, holding that a police officer violates a criminal defendant’s constitutional rights by withholding exculpatory evidence from prosecutors.
To make out a claim that the Officers violated his constitutional rights by suppressing exculpatory evidence, Owens must allege, and ultimately prove, that (1) the evidence at issue was favorable to him; (2) the Officers suppressed the evidence in bad faith;[6] and (3) prejudice *397 ensued. See Monroe v. Angelone, 323 F.3d 286, 299-300 (4th Cir.2003). Prejudice ensues if “there is a reasonable probability” that the jury would have reached a different result had the evidence been properly disclosed. United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). The adjective “reasonable” is important in this context. See Kyles v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). As the Supreme Court has explained, “[t]he question is not whether the defendant would more likely than not have received a different verdict” had the evidence been disclosed. Id. Rather, the question is whether, in the absence of disclosure, the defendant “received a fair trial, understood as a trial resulting in a verdict worthy of confidence.” Id.
Owens alleges that Officers Pelligrini, Dunnigan, and Landsman, at the direction of ASA Brave, subjected Thompson, the State’s star witness, to a lengthy mid-trial interrogation, in which they threatened and cajoled him to change his testimony repeatedly so as to strengthen the State’s then-“failing prosecution.” Owens asserts that the Officers elicited from Thompson a succession of vastly different accounts of his and Owens’s involvement in Ms. Williar’s rape and murder. These accounts ranged from Thompson’s insistence that he had nothing to do with the crimes, to his admission that he had broken into Ms. Williar’s apartment (but stayed downstairs), to his contention that he had remained in the upstairs bathroom and only heard the assault on Ms. Williar, to his final story, in which he asserted that he had masturbated at the foot of the bed while Owens raped and killed Ms. Williar.
Moreover, Owens alleges that Thompson repeatedly changed his story only because the Officers provided additional details about the crime, which they pressured Thompson to incorporate so as to incriminate Owens more directly. When the interview ended, the Officers told ASA Brave only about the witness’s last version of events. That is, Owens alleges that ASA Brave did not know (and so could not and did not tell defense counsel) that Thompson had offered several other accounts of the crimes, all of which conflicted with the iteration Thompson ultimately told the jury.
We have little difficulty concluding that Owens’s allegations state a plausible § 1983 claim. First, the information Officers Pelligrini, Dunnigan, and Landsman assertedly withheld from ASA Brave was favorable to Owens. Had the Officers properly disclosed Thompson’s statements, his inconsistencies would have lent support to the contention advanced by Owens’s defense that Thompson, not Owens, had raped and murdered Ms. Williar. At a minimum, the inconsistencies would have aided Owens in his attempt to discredit Thompson’s testimony and sow reasonable doubt in the minds of the jurors. See Bagley, 473 U.S. at 676, 105 S.Ct. 3375 (holding that Brady’s duty to disclose evidence encompasses impeachment evidence).
Second, Owens has offered specific allegations as to the Officers’ bad faith. He asserts that these experienced police offi *398 cers willfully, consciously, and in bad faith “chose not to disclose” the multiple revisions to Thompson’s statement that they elicited from him during their hours-long interrogation. Further, he alleges that the Officers told ASA Brave about the final version of the story almost as soon as the witness had said it. The temporal proximity between Thompson’s succession of narratives and the Officers’ report to the prosecutor lends support to the contention that Thompson’s inconsistent narratives were fresh in the Officers’ minds, and thus, the Officers’ omissions were not accidental, but intentional and malicious.
Finally, Owens’s allegations satisfy Brady ’s materiality requirement. Owens asserts that Thompson was the State’s “star witness,” and that in post-trial proceedings, ASA Brave admitted that without Thompson, “the case could not have gone forward.” Certainly, it is plausible that impeachment of such a key witness could have altered the outcome at trial. We emphasize that Brady does not require that disclosure probably would have modified a trial’s result. Strickler, 527 U.S. at 289-90,119 S.Ct. 1936. On the contrary, it is enough that the suppression of evidence cast serious doubt on the proceedings’ integrity. Id. If Owens can prove his allegations, they would certainly satisfy this requirement.[7]
B.
We next turn to the question of whether Owens’s constitutional rights were “clearly established” in February and March 1988, when the Officers acted.
i.
For a right to be clearly established, its contours “must be sufficiently clear [such] that a reasonable official would [have] understood] that what he is doing violates that right.” Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). “This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held [to be] unlawful.” Hope v. Pelzer, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). Rather, liability obtains if the state of the law is such that it would have been “apparent” to an officer that his conduct violated constitutional law. Anderson, 483 U.S. at 640, 107 S.Ct. 3034.
In evaluating whether qualified immunity exists, we must keep in mind that it is the plaintiffs constitutional right that must be clearly established, not a plaintiffs access to a monetary remedy. Thus, a right does not become clearly established only if a plaintiff has successfully enforced it through a § 1983 action. Hope, 536 U.S. at 741, 122 S.Ct. 2508. On *399 the contrary, a right may be clearly established by any number of sources, including a criminal case, a statute, or the Constitution itself. See, e.g., id. (relying on the Eighth Amendment to conclude that a right was clearly established); Collier v. Dickinson, 477 F.3d 1306, 1312 (11th Cir. 2007) (relying on a statute to determine that a right was clearly established); Cinelli v. Cutillo, 896 F.2d 650, 655 (1st Cir.1990) (relying on habeas and criminal cases to determine that a right was clearly established).
Furthermore, to be clearly established, a right need not be one with respect to which all judges on all courts agree. Rather, “[i]f the unlawfulness is apparent, the fact that some court may have reached an incorrect result will not shield a defendant’s violation of a clearly established right.” See Wilson v. Layne, 141 F.3d 111, 122 (4th Cir.), aff'd, 526 U.S. 603, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). Thus, although judicial disagreement about the existence of a right is certainly a factor we consider in determining whether a right has been clearly established, see Pearson, 555 U.S. at 245, 129 S.Ct. 808, disagreement alone does not defeat a plaintiffs claim in every instance. The Supreme Court has never sanctioned such a rule, see, e.g., Hope, 536 U.S. at 745-46, 122 S.Ct. 2508 (holding a right was clearly established and rejecting a qualified-immunity defense notwithstanding the contrary views of three dissenting justices and the court of appeals), and neither have we, see, e.g., Henry v. Purnell, 652 F.3d 524, 536-37 (4th Cir.2011) (en banc) (rejecting a qualified-immunity defense over a three-judge dissent).
With these principles in mind, we consider whether the constitutional rights Owens asserts were clearly established as of February and March 1988, the time of the alleged violations.
ii.
As outlined above, the Supreme Court held in 1963 that a prosecutor may not suppress material exculpatory evidence during a defendant’s criminal trial. Brady, 373 U.S. at 87, 83 S.Ct. 1194. In Barbee, decided a year after Brady, we held that “[t]he police are also part of the prosecution,” and thus, they too violate the Constitution if and when they suppress exculpatory evidence. 331 F.2d at 846.
In 1976, we applied Barbee’s holding expressly to impeachment evidence. In both United States v. Sutton, 542 F.2d 1239 (4th Cir.1976), and Boone v. Paderick, 541 F.2d 447 (4th Cir.1976), we overturned a defendant’s criminal conviction on the ground that police had suppressed exculpatory information bearing on the veracity of a witness’s testimony. See Sutton, 542 F.2d at 1241 n. 2, 1243; Boone, 541 F.2d at 453. As in Barbee, we reiterated that where “material evidence which tends to exculpate the defendant is not disclosed,” the failure to disclose it “is not neutralized because it was in the hands of the police rather than the prosecutor.” Boone, 541 F.2d at 450-51.
Finally, in Goodwin, 885 F.2d at 163-64, we applied Barbee’s logic to § 1983 cases. See also Carter v. Burch, 34 F.3d 257, 263-64 (4th Cir.1994). In Goodwin, we upheld a jury award of thousands of dollars against a South Carolina police officer who, in 1983, failed to disclose exculpatory evidence. In doing so, we rejected the officer’s qualified-immunity defense because we determined that a “reasonable officer [acting in 1983] would have known that a prosecution carried out without ... disclosure of exculpatory information would violate the constitutional rights of the criminal defendants.” 885 F.2d at *400 164.[8] Goodwin thus capped an unbroken chain of circuit precedent affirming—then reaffirming—that criminal defendants’ rights are violated by police officers’ malicious suppression of evidence.
The partial dissent offers a different view. It maintains that the law was not clearly established in 1988 because the cases decided before that date—Barbee, Sutton, and Boone—imposed no independent obligation on police officers to disclose exculpatory evidence. The dissent insists that Barbee, Sutton, and Boone stand only for the proposition that “a police officer’s knowledge of exculpatory evidence will be imputed to the prosecutor for Brady purposes.” This holding, the dissent contends, fails to notify police officers of their susceptibility to suit, and thus, the Officers in the case at hand enjoy qualified immunity.
We cannot agree. Qualified immunity exists to ensure that “public officials performing discretionary functions [are] free to act without fear of retributive suits ... except when they should have understood that particular conduct was unlawful.” Limone v. Condon, 372 F.3d 39, 44 (1st Cir.2004). Ever since it first articulated the contours of modern qualified-immunity doctrine, the Supreme Court has emphasized that qualified immunity assesses the apparent unlawfulness of conduct. See Harlow, 457 U.S. at 819, 102 S.Ct. 2727 (“[W]here an official could be expected to know that certain conduct would violate statutory or constitutional rights ..., a person who suffers injury caused by such conduct may have a cause of action.” (emphasis added)); see also id. (explaining that qualified immunity provides “no license to lawless conduct” (emphasis added)); Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (explaining that qualified immunity concerns “whether the conduct of which the plaintiff complains violated clearly established law” (emphasis added)).
Barbee, Sutton, and Boone each held that certain conduct by police officers—the suppression of material exculpatory evidence—results in the violation of criminal defendants’ rights. Whether or not an officer’s knowledge is “imputed” to the prosecutor does not affect the lawfulness of the officer’s own conduct. See Limone, 372 F.3d at 47 (rejecting police officers’ argument that law was not clearly established because cases announcing plaintiffs constitutional right referenced “the State’s” obligations, not those of police officers). Barbee, Sutton, and Boone taught police officers how to conform then-conduct to the law. These cases each held that if a police officer suppresses material exculpatory evidence, courts will invalidate a defendant’s criminal sentence as unconstitutional. A police officer acting after the issuance of these decisions, like each of the Officers here, could not have thought that the suppression of material exculpatory evidence would pass constitutional muster. See, e.g., Ginelli, 896 F.2d at 655 (holding that police officers were on notice of constitutional right’s existence because prior cases had invalidated criminal sentences based on similar misconduct).
Goodwin recognized this reality, and held in light of Barbee, Sutton, and Boone *401 that a police officer’s obligation to disclose material exculpatory evidence was clearly established by 1983, five years prior to the Brady violations alleged in this ease. Yet the dissent suggests that our reliance on Goodwin retroactively subjects the Officers to liability. Not so. For although Goodwin issued after the Officers in this case acted, Goodwin announced no new rule of constitutional law. Rather, it merely held, in light of the constitutional rule already established by Barbee, Sutton, and Boone, that a police officer’s duty to disclose material exculpatory evidence was dearly established in 1983. If a right was clearly established in 1983 (as Goodwin held), it must have been clearly established in 1988 (when the Officers acted). To hold to the contrary would directly conflict with Goodwin.[9]
Indeed, if the dissent is correct and Barbee, Sutton, and Boone announced no rule of constitutional law applicable to police officers, then Goodwin was wrongly decided. For according to the dissent’s view, Goodwin acted in the absence of any prior circuit precedent to hold that a constitutional right was clearly established and so a police officer did not enjoy qualified immunity. We cannot endorse such an extraordinary view of our precedent.
In sum, our precedent unmistakably provides that, by 1988, a police officer violates clearly established constitutional law when he suppresses material exculpatory evidence in bad faith. Accordingly, we hold that the Officers were clearly on notice of the impermissibility of their conduct in 1988, the time of the alleged violations.[10]
V.
Finally, we address whether Owens has stated a plausible claim against the BCPD.
*402 A.
Section 1983 provides that “[e]very person,” who, under color of state law causes the violation of another’s federal rights shall be liable to the party injured by his conduct. See 42 U.S.C. § 1983. In Monell v. New York City Department of Social Services, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court held that municipalities qualify as “persons” under the statute, rendering them amenable to suit.
Unlike public officials, municipalities do not enjoy qualified immunity. See Owen v. City of Independence, 445 U.S. 622, 638, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980). Accordingly, claims against municipalities are measured against current law, without regard to whether municipalities’ obligations were clearly established at the time of the alleged violations. Id. at 634, 100 S.Ct. 1398; see also Barber v. City of Salem, 953 F.2d 232, 237-38 (6th Cir.1992).
For these reasons, the district court erred in dismissing Owens’s claims against the BCPD on the basis of qualified immunity. Apparently recognizing this, the BCPD does not now contend that it has immunity. Rather, it argues that dismissal of the claim against it was nonetheless proper because Owens has assertedly “failed to plead sufficient facts” to set forth a plausible Monell claim. Appellees’ Br. 43. We turn to that argument.
B.
Although municipalities, unlike public officials, cannot claim immunity from suit, the Supreme Court has expressly cabined their liability: under Monell, a municipality is liable only for its own illegal acts. See 436 U.S. at 691, 98 S.Ct. 2018 (stating that a municipality “cannot be held liable solely because it employs a tortfeasor” (emphasis in original)); see also Connick v. Thompson, — U.S. -, 131 S.Ct. 1350, 1359, 179 L.Ed.2d 417 (2011) (“[Municipalities] are not vicariously liable under § 1983 for their employees’ actions.”). Pursuant to this standard, a municipality is liable under § 1983 if it follows a custom, policy, or practice by which local officials violate a plaintiffs constitutional rights. Monell, 436 U.S. at 694, 98 S.Ct. 2018. Only if a municipality subscribes to a custom, policy, or practice can it be said to have committed an independent act, the sine qua non of Monell liability.
Here, Owens alleges that the BCPD violated his federal constitutional rights pursuant to a municipal custom, policy, or practice. Specifically, he alleges that “[a]t all times relevant to this ease,” the BCPD “maintained a custom, policy, and/or practice” of condoning its officers’ conduct in “knowingly, consciously, and repeatedly with[holding] and suppressing]” exculpatory evidence. Owens’s complaint thus alleges a theory of custom “by condo-nation.” Spell v. McDaniel, 824 F.2d 1380, 1390 (4th Cir.1987). Under this theory of liability, a city violates § 1983 if municipal policymakers fail “to put a stop to or correct a widespread pattern of unconstitutional conduct.” Id. at 1389. Owens alleges that by failing to correct its officers’ pervasive suppression of evidence, the BCPD injured him, committing an independent act that renders it liable under § 1983.
Prevailing under such a theory is no easy task. A plaintiff must point to a “persistent and widespread practice[ ] of municipal officials,” the “duration and frequency” of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their “deliberate indifference.” Id. at 1386-91 (alterations omitted). Both knowledge and indifference *403 can be inferred from the “extent” of employees’ misconduct. Id. at 1891. Sporadic or isolated violations of rights will not give rise to Monell liability; only “widespread or flagrant” violations will. Id. at 1387.
Although prevailing on the merits of a Monell claim is difficult, simply alleging such a claim is, by definition, easier. For to survive a motion to dismiss under Rule 12(b)(6), a complaint need only allege facts which, if true, “ ‘state a claim to relief that is plausible on its face.’ ” Iqbal, 556 U.S. at 678, 129 S.Ct. 1937 (quoting Twombly, 550 U.S. at 570, 127 S.Ct. 1955) (emphasis added). The recitation of facts need not be particularly detailed, and the chance of success need not be particularly high. See Iqbal, 556 U.S. at 678, 129 S.Ct. 1937; Twombly, 550 U.S. at 570, 127 S.Ct. 1955. A plaintiff fails to state a claim only when he offers “labels and conclusions” or for-mulaieally recites the elements of his § 1983 cause of action. Iqbal, 556 U.S. at 678,129 S.Ct. 1937.
In support of his claim, Owens alleges that “[rjeported and unreported cases from the period of time before and during the events complained of’ establish that the BCPD had a custom, policy, or practice of knowingly and repeatedly suppressing exculpatory evidence in criminal prosecutions. He further alleges that “a number of motions were filed and granted during this time period that demonstrate that [the BCPD] maintained a custom, policy, or practice to allow this type of behavior either directly or ... by condoning it, and/or knowingly turning a blind eye to it.” The assertions as to “reported and unreported cases” and numerous “successful motions” are factual allegations, the veracity of which could plausibly support a Monell claim. That BCPD officers withheld information on multiple occasions could establish a “persistent and widespread” pattern of practice, the hallmark of an impermissible custom. Spell, 824 F.2d at 1386. If (but only if) the duration and frequency of this conduct was widespread and recurrent, the BCPD’s failure to address it could qualify as “deliberate indifference.” Id. at 1391.
Urging a different result, the BCPD contends that Owens alleges nothing more than “unadorned, the-defendant-unlawfully-harmed-me accusation[s].” See Appel-lees’ Br. 47 (quoting Iqbal, 556 U.S. at 678, 129 S.Ct. 1937). We recognize, of course, that courts have dismissed Monell claims when the plaintiff has alleged nothing more than a municipality’s adherence to an impermissible custom. But Owens has done more than that: Owens has alleged facts—the existence of “reported and unreported cases” and numerous “successful motions”—which, if true, would buttress his legal conclusion.
Owens’s brief, but non-conclusory, allegations closely resemble those in Haley v. City of Boston, 657 F.3d 39 (1st Cir.2011). There, a defendant was convicted of murder when two Boston police officers suppressed a witness’s statement casting doubt on his guilt. Id. at 45. The defendant discovered this Brady material, and after thirty-four years in prison, obtained his release; he then sued the Boston Police Department under § 1983. The First Circuit reversed the district court’s dismissal of the claim, holding that the defendant had stated a plausible Monell claim against the Boston Police Department in view of the “wholly unexplained” nature of its officers’ suppression of evidence and the alleged (but not identified in the opinion or record) “volume of cases” involving similar violations in the Boston Police Department. Id. at 53; see also Complaint, Haley v. City of Boston, 677 F.Supp.2d 379 (D.Mass.2009) (No. 1:09-cv-10197). The Haley court concluded that this “volume” *404 of other cases documenting officers’ suppression of evidence lent credence to the claim that policymakers “encouraged, or at least tolerated” an impermissible practice. Haley, 657 F.3d at 53. Accordingly, “[although [the complaint was] couched in general terms,” the court concluded that the complaint nonetheless “contain[ed] sufficient factual content to survive a motion to dismiss.” Id.
The same reasoning applies here. Of course, to prevail on the merits, Owens will have to do more than allege a pervasive practice of BCPD misconduct; he must prove it. But at this early stage in the proceedings, we must conclude that Owens has pled sufficient factual content to survive Rule 12(b)(6) dismissal.
VI.
For the reasons set forth above, we affirm the judgment of district court to the extent it dismisses Owens’s claims against the Baltimore City State’s Attorney’s Office. We vacate the judgment in all other respects. We remand the case to the district court for further proceedings consistent with this opinion.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED

. Owens also alleges that ASA Brave withheld impeachment evidence with respect to a different witness: Larry Oliver, Owens's cellmate. Specifically, Owens asserts that ASA Brave intentionally withheld the fact that he had promised leniency to Oliver, who testified that Owens confessed to him in their jail cell. Because the issues involved in this asserted nondisclosure are identical to those involved in ASA Brave's nondisclosures regarding Thompson and the DNA evidence, we focus only on those facts for the sake of simplicity.

. This is not to say that Owens could not have filed suit immediately upon his discovery of the Appellees' asserted suppression of material exculpatory evidence. See Wallace, 549 *391 U.S. at 390 n. 3, 127 S.Ct. 1091; but see Heck v. Humphrey, 512 U.S. 477, 486-87, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994) (holding that the date of accrual for a § 1983 claim is delayed if a § 1983 judgment in a plaintiff's favor would imply the invalidity of the plaintiff's criminal conviction). Although the statute of limitations did not begin to run until the proceedings against Owens were favorably and finally terminated, because he knew of his alleged injury before then, he was entitled to seek relief earlier. Wallace, 549 U.S. at 390 n. 3, 127 S.Ct. 1091.

. In doing so, the Supreme Court majority expressly rejected the suggestion in Justice Souter's concurring opinion that the Court had adhered too closely to the common law analogue. Heck, 512 U.S. at 484 n. 4, 114 S.Ct. 2364. Yet it is precisely this argument from Justice Souter, rather than the majority’s reasoning, on which the dissent relies in criticizing us.

. Relatedly, in his appellate brief, Assistant State’s Attorney Brave contends that absolute prosecutorial immunity requires dismissal of the claims against him. Brave waived this defense, however, by failing to raise it in the district court. See Tully v. Barada, 599 F.3d 591, 594 (7th Cir.2010); Collyer v. Darling, 98 F.3d 211, 222 (6th Cir.1996). Moreover, because absolute immunity attaches to functions, not offices, see Harlow v. Fitzgerald, 457 U.S. 800, 808-09, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the district court must determine whether Brave was performing prosecutorial functions at the time he allegedly committed the asserted constitutional violations, cf. Buckley v. Fitzsimmons, 509 U.S. 259, 273, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993) (holding that absolute immunity does not attach to prosecutors performing "investigatory functions”).

. Because we hold that the Baltimore City State’s Attorney’s Office is not a suable entity, we do not address its alternative argument, i.e., that the State’s Attorney’s Office is an arm of the State entitled to sovereign immunity. We note, however, that the partial dissent focuses its arm-of-the-State analysis on a single factor—whether a judgment against the Baltimore City State’s Attorney's Office would be paid by the City of Baltimore—to conclude that the State's Attorney’s Office lacks immunity from suit. Although the Supreme Court had previously regarded this factor as the most important, it has subsequently abandoned this view. See Fed. Maritime Comm'n v. S.C. Port Auth., 535 U.S. 743, 765, 122 S.Ct. 1864, 152 L.Ed.2d 962 (2002); U.S. ex rel. Oberg v. Ky. Higher Educ. Student Loan Corp., 681 F.3d 575, 580 n. 3 (4th Cir.2012). Accordingly, when engaging in an arm-of-the-State analysis, a court must also consider at least three other factors—the degree of autonomy exercised by an entity, whether an entity is involved with state concerns, and how an entity is treated under state law—without giving preeminence to any single factor. See Oberg, 681 F.3d at 580.

. As recognized in Jean v. Collins, 221 F.3d 656, 660 (4th Cir.2000) ("Jean II”) (Wilkinson, C.J., concurring), police officers and prosecutors have different obligations with respect to the disclosure of exculpatory evidence. Under Brady, a prosecutor violates *397 the Constitution whenever he fails to disclose material, exculpatory evidence, even if the nondisclosure was purely accidental. See 373 U.S. at 87, 83 S.Ct. 1194. The Sixth Circuit has applied this same absolute standard to police officers. See Moldowan v. City of Warren, 578 F.3d 351, 388-89 (6th Cir.2009). But other courts have followed the lead of Jean II to conclude that police officers commit constitutional violations only when they suppress exculpatory evidence in bad faith. See Porter v. White, 483 F.3d 1294, 1308 (11th Cir.2007); Villasana v. Wilhoit, 368 F.3d 976, 980 (8th Cir.2004).

. The Officers unpersuasively contend that Owens’s Brady claim fails because he obtained his release from prison on the basis of newly discovered DNA evidence rather than the undisclosed Brady material. But contrary to the Officers' assertion, courts routinely consider the Brady claims of § 1983 plaintiffs exonerated on the basis of newly discovered DNA evidence. See, e.g., Holland v. City of Chicago, 643 F.3d 248, 250, 255-56 (7th Cir.2011). Moreover, adopting the Officers’ rule would have the perverse effect of discriminating against innocent plaintiffs. For although a § 1983 plaintiff need not establish that he is actually innocent of the crime for which he was convicted, see Strickler, 527 U.S. at 289-90, 119 S.Ct. 1936; Poventud v. City of New York, 750 F.3d 121, 133 (2d Cir.2014) (en banc), if he can prove his innocence—for example, because DNA evidence completely exonerates him—the Officers’ rule would prevent that plaintiff from recovering for the Brady violation that put him in prison. We see no reason to insulate from liability police officers who withhold exculpatory evidence in bad faith- merely because unrelated DNA evidence later came to light proving the plaintiff’s innocence.

. We were not alone. Other circuits have similarly held that by 1988, police officers violated the Constitution by suppressing exculpatory evidence in bad faith. See, e.g., McMillian v. Johnson, 88 F.3d 1554, 1569 (11th Cir.1996) (discussing 1987 police action); Walker v. City of New York, 974 F.2d 293, 299 (2d Cir.1992) (discussing 1971 police action); Jones v. City of Chicago, 856 F.2d 985, 995 (7th Cir.1988) (discussing 1981-82 police action); Geter v. Fortenberry, 849 F.2d 1550, 1559 (5th Cir.1988) (discussing 1982 police action).

. In hopes of convincing us to the contrary, the Officers rely on Jean v. Collins, 155 F.3d 701 (4th Cir.1998) (“Jean I”), vacated, 526 U.S. 1142, 119 S.Ct. 2016, 143 L.Ed.2d 1029 (1999), which they contend renders the state of our precedent uncertain. That opinion, however, does not assist them. Jean I addressed conduct that took place in 1982— predating the conduct we held unconstitutional in Goodwin, and six years before the conduct at issue in this case. Moreover, soon after the issuance of Jean I, the Supreme Court vacated the decision for further consideration in light of Wilson v. Layne, 526 U.S. 603, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). See Jean v. Collins, 526 U.S. 1142, 119 S.Ct. 2016, 143 L.Ed.2d 1029 (1999). On remand, because the en banc court was equally divided, the district court’s denial of relief was affirmed. Those judges voting to affirm concluded that summary judgment was appropriate because the plaintiff had failed to offer sufficient evidence of the Officers’ unconstitutional conduct. Jean II, 221 F.3d at 663 (Wilkinson, C.J., concurring). These judges nonetheless left intact Barbee, Sutton, Boone, and Goodwin, and expressly affirmed that "a police officer’s actions in failing to turn over materially exculpatory evidence to a prosecutor” violates a criminal defendant’s constitutional rights. Id. at 659 (quotation marks and alterations omitted).

. The Officers unpersuasively rely on three unpublished posf-1988 opinions to bolster their contention that the rights Owens asserts were not clearly established in 1988. But, as we have repeatedly explained, unpublished opinions are not precedent in this circuit. See, e.g., Hogan v. Carter, 85 F.3d 1113, 1118 (4th Cir. 1996) (en banc). Thus, these unpublished opinions cannot alter the clear rule set forth in the published opinions discussed above. Nor do they reflect the kind of judicial disagreement that makes qualified immunity appropriate. Just as a dissent does not articulate the law of the case, unpublished opinions do not articulate the law of the circuit. Both may reflect judicial disagreement about whether a right is in fact clearly established, but neither can displace the circuit’s binding authority. Cf. Brockington, 637 F.3d at 507 (holding that unpublished decisions suggesting that no constitutional right was violated did not entitle a defendant to qualified immunity).